John Herman DOLES, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–88–00134–CR.

Court of Appeals of Texas, Tyler.

Dec. 29, 1989.

Clyde Howard, Nacogdoches, for appellant.

Michael L. Graham, Dist. Atty., Nacogdoches, for appellee.

COLLEY, Justice.

Appellant John Herman Doles was convicted of aggravated sexual assault[1] of a male child under the age of fourteen by a jury who assessed his punishment at life imprisonment.

Appointed counsel on appeal[2] did not represent the appellant at trial. Appellant presents two points of error. By his first point, appellant claims that he was deprived of effective assistance of counsel at trial. Under his second point of error, he contends the court erred at the punishment phase by instructing the jury on "the effects of parole law...." We sustain appellant's first point of error, reverse the conviction, and remand the cause for new trial.

Appellant contends that his trial counsel's performance was constitutionally deficient in several respects. First, he complains of counsel's persistent failure to object to evidence of extraneous offenses, and to hearsay testimony introduced during the State's examination of its witnesses, Melanie Cleveland, Dr. Frankie Clark, Brenda Kay McBride, Stephen James Dosey, Ola Faye Fenton, and J.R.M., the victim of the charged offense. Second, he alleges that trial counsel "opened the door ... for the [introduction] into evidence of State's Exhibit 2."[3] Third, appellant alleges that his trial counsel failed to make proper objections to what he terms irrelevant and "highly inflammatory testimony ... concerning the general life-style of [appellant] ... [and] the condition[s]" of appellant's various homes.

Appellant asserts that when these identified errors are considered in the context of the entire record, it is plain that he was deprived of reasonably effective assistance of counsel, and hence of a fair trial and due process of law under the sixth and fourteenth amendments to the United States Constitution.

Before we review the testimony, we deem it appropriate to state that from our reading of the entire record, it is clear that the defense presented and relied on by appellant was that he did not commit the charged offense, and that his stepchildren, J.R.M., Brenda Kay McBride, and Stephen James Dosey, all of whom disliked him, had been persuaded by DHS workers to testify falsely against him in the case. Appellant denied that he had ever sexually assaulted the victim or any other child. Appellant provided witnesses, including his wife and other relatives, each of whom expressed a

---

1. Pursuant to Tex.Penal Code Ann. § 22.021(a)(1)(B)(ii) and (a)(2)(B) (Vernon 1989).

2. The Court of Criminal Appeals granted an out-of-time appeal in this case.

3. The written statement of State witness Brenda Kay McBride which contains allegations of extraneous sexual offenses committed by appellant against children other than the complainant.

strong disbelief that appellant assaulted the victim.

State's first witness was Melanie Cleveland, a Texas Department of Human Services (DHS) child protective worker. After detailing her education and training background, Cleveland testified that on July 22, 1986, she first met appellant and his wife, Patsy Doles, and the six young children in the household: viz., J.R.M. (the victim); Brenda Kay McBride, who is the victim's full sister; and Miles Dosey, Stephen Dosey, John Doles, Jr., and Amanda Doles, J.R.M.'s half-siblings. Cleveland stated that at that time, "Brenda was 12, [J.R.M.] was 11, Miles was 10, Stephen was 7, Amanda was 2 and John was three." Cleveland related that on that date, "there was molding and rotting food on the table, old grease...." She testified that all the children, including the victim, were removed from the Doles home and placed in foster care. Cleveland also stated that the victim, Miles, and Stephen were a "little slow" mentally, and that she held the opinion that "one of the reasons why they're a little slow is that they have been deprived of an educational background all of their lives—and never until the time that they were in foster care [had] gone to school on a regular basis." Later in her testimony, Cleveland related that another home, previously occupied by appellant and his wife, Patsy, was "one of the most deplorable homes I'd ever been in in my life, the stench—I had to leave because the stench was so bad. There was dirty clothing everywhere, spoiled food, rotting food. The children were filthy, dirt in their ears, dirt underneath their fingernails, dirty clothes. They smelled dirty." Defense counsel made no objection to the foregoing testimony of Cleveland.

On redirect examination, the prosecutor asked Cleveland whether the *children*[4] "[told her] about things that occurred between them and [appellant]?" Cleveland replied, "Yes, sir." Another time, when the prosecutor asked her if she had seen the children cry, Cleveland said, "I've also seen them cry when relating to me the events of the sexual abuse as it occurred." Defense counsel made no objection to the foregoing testimony of Cleveland.

Dr. Frankie Clark, a private psychologist contracting with DHS, testified for the State. The prosecutor asked her if [J.R.M.] related to her "the first time you came in contact with him, a set of circumstances about a sexual assault that occurred [to] him?" Dr. Clark answered affirmatively, and then was asked by the prosecutor, "[H]as that changed as far as the facts are concerned up until this time?" The witness answered, "No, sir; it has not." Defense counsel made no objection to Clark's testimony.

Louise Smith, the foster parent caring for [J.R.M.] was asked by the prosecutor, "Did [J.R.M.] talk to you about the sexual assault with [appellant]?" She answered, "Yes, he did." Later Smith was asked by the prosecutor, "[s]ince [J.R.M.] has been in your home, the story and the facts as you got them about the sexual assault originally ... has [sic] those facts changed in any way? Are they the same now as they were back then?" Smith replied, "No, I don't think they've changed any. No, I think they're pretty well just exactly like they were the first time he told it." Once again, defense counsel made no objections to the foregoing testimony of Dr. Clark.

Ola Faye Fenton, the paternal aunt of [J.R.M.], stated on direct examination by the State that she had two sons, one thirteen and the other twelve. Upon inquiry by the prosecutor, the witness testified that "[J.R.M.] said that [appellant] had been making him have oral sex with him." The prosecutor then asked Fenton to explain her statement about "oral sex," and Fenton replied, "[J.R.M.] said that [appellant] would make him—suck his dick." The prosecutor later asked the witness, "Did you believe him in what he said?" The witness responded, saying, "No, I didn't believe him at first." The prosecutor then asked Fenton, "Did you later on believe him?" Fenton replied, "Yes." On

---

**4.** The record reflects that the prosecutor said to the witness in direct reference to this question, "I'm talking about Brenda Kay McBride, Stephen Dosey, Miles Dosey, and [J.R.M.]."

redirect examination by the prosecutor, Fenton twice reiterated the latter testimony. Defense counsel made no objections to the foregoing testimony of Ola Faye Fenton.

Brenda Kay McBride, a sister of [J.R.M.] and the step daughter of appellant, testified for the State. She testified that she "[saw appellant] put his penis in [J.R.M.'s] mouth" one time in Arkansas, and two times in Nacogdoches. She also testified that appellant threatened "[t]o whip ... or ... kill us if we ever [told]." After this, Brenda, when asked by the prosecutor "[d]id [appellant] ever talk to you about you sucking his penis?[,]" answered, "Yes, sir" and said that she refused to do so. Defense counsel made no objection.

On cross-examination, defense counsel utilized a written statement dated August 12, 1986, that Brenda had given to Vickie Rogers, a DHS supervisor. Counsel read portions of the statement to the witness McBride, and elicited testimony from her that she "hated" appellant "[f]or what he done [sic] to the boys and all those threats he put on us." Defense counsel read into the record portions of Brenda's written statement, including, "[F]ive weeks after Ola Faye [Fenton] told me that—what [appellant] did to her boys [appellant] did the same thing to [J.R.M.]."

The victim testified on direct examination about several instances where appellant sexually assaulted him including assaults taking place in Arkansas, Nacogdoches, Garrison and San Augustine. The victim also testified that appellant threatened to "kill me if I told."

On redirect examination, the victim testified that appellant had sexually assaulted him throughout the time the victim's mother (Patsy Doles) and appellant had "been living—or staying together...."

Stephen James Dosey, a 7-year-old stepchild of appellant and half brother of the victim, testified that he saw appellant "put his weiner in [the victim's] mouth" in Nacogdoches. This child, in response to the prosecutor's question, "[H]as [appellant]

ever done that to you?[,]" replied, "Yes, sir." The child witness repeated his testimony about the coerced oral sodomy on the victim and himself without any objection by defense counsel.

Perhaps the most serious challenge by appellant to his trial counsel's performance involves the testimony of Vickie Rogers, a Department of Human Resources Protective Services Supervisor. Rogers was called by the defense after the State rested its case in chief. During his examination of Rogers, defense counsel established that Rogers took a written statement from Brenda Kay McBride, appellant's stepdaughter. Defense counsel questioned Rogers about the statement, and specifically identified the statement as bearing the date of August 12, 1986, at 1:35 p.m. Counsel reviewed several portions of the statement, quoting aloud certain of its contents. He elicited testimony from Rogers about McBride's statements, and he paraphrased or quoted parts of the statement, mixing his questions with quotes from the child's statement.

The State in its cross-examination of Rogers offered the entire 1986 statement of Brenda McBride as State Exhibit No. 2, and the same was admitted over defense counsel's "best evidence" objection. The statement contains, inter alia, the following:

> I get real upset at [appellant] for what he did to [the victim] and the *other boys*....
>
> [Appellant] made [the victim] suck his peter. I know this because he made Fay's boys do it first. She wouldn't lie to me. She told me about what [appellant] made her boys do. It was the same thing he made [the victim] do. Five weeks after Ola Fay [5] told me what [appellant] did to her boys, [appellant] did the same thing to [the victim].
>
> He took [the victim] out in the woods. They came back and [the victim] had a funny look. We were living in Nacogdoches at one of the old houses, not Drewery. The first time he took [the victim] off in the woods was when we lived in

5. "Ola Fay" is Ola Faye Fenton, a paternal aunt of the victim and Brenda.

Garrison. I wasn't much younger than I am now.... He did it once in Garrison and one time in Nacogdoches and one time in Arkansas. [Appellant] worked at a minnow place in Arkansas and also worked at a dairy place in Nacogdoches. He would take Ola Fay's boys and [the victim] to the dairy with him. He made Ola Fay's boys suck his peter. That's what Ola Fay told me. Darryl Gene Fenton told me first. Then [the victim] and Ola Fay told me at the same time....

I think he may have done something with Steven and Myles because if he makes [the victim] do that, he may make the other boys do it too....

[Appellant] asked me, he said, 'Brenda come here.' He said, 'I'm going to check on the minnows. You go get in the van.' I said, 'Are you ready to go home?' He said, 'Not yet.' Then he got some gold fish and got in the van and said, 'Why don't you suck my peter?'....

The statement also contains Brenda's allegations that appellant drank a lot and physically abused her, leaving "bruises on me with a belt." The last portion of the statement reads in part: "I feel sorry for mama [appellant's wife]. She has a sorry man."

The State argues that the statement in its entirety is admissible under Tex.R.Crim. Evid. 801(e)(1)(B) which provides:

(e) Statements Which Are Not Hearsay. A statement is not hearsay if:

(1) Prior Statement by Witness. The declarant testifies at the trial ... and is subject to cross-examination concerning the statement, and the statement is ...

(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication....

If, as the State maintains, Brenda's entire written statement was admissible under rule 801(e)(1)(B), that was so only because of defense counsel's failure to make proper objection to Brenda's testimony on direct examination regarding the sexual offense allegedly committed by appellant

against her, and her testimony on cross-examination that she "hated" appellant and that he had allegedly committed sexual assaults against "Ola Fay's boys ... [,]" which were identical to the offense committed against the victim. Therefore, the statement's admissibility served to magnify the prejudice flowing from that counsel's initial errors. Moreover, as claimed by appellant, since his own counsel introduced portions of the statement before the jury, the State was clearly entitled to introduce the entire statement under rule 107 without regard to its admissibility under rule 801.

In *Hernandez v. State*, 726 S.W.2d 53 (Tex.Cr.App.1986), the court held that the protection afforded defendants against ineffective assistance of counsel under Texas law is identical to the protection afforded by the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). So, we must analyze the record and "identify the acts or omissions of counsel [in this case] that are *alleged* not to have been the result of reasonable professional judgment[,]" *Hernandez*, 726 S.W.2d at 55; *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, to "determine whether, in light of all the circumstances, [those] acts or omissions were outside the wide range of professionally competent assistance." *Id.* We are instructed by *Strickland* to bear in mind that all counsel "[are] strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Nevertheless, it plainly appears that the determination of actual ineffective assistance finally rests on the overall purposes of the sixth amendment, to wit: "[T]hat a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 691–92, 104 S.Ct. at 2067. *Strickland* requires that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the [U.S.] Constitution." *Id.* The Supreme Court in *Strickland* stated, "Representation is an art, and an act or omission that is unprofessional in one case may

be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067. Additionally, it is clear from the opinion that the effect of the error must be "sufficiently serious to warrant setting aside the outcome of the proceeding." *Id.* Indeed, the *Strickland* court defined the proper "outcome-determinative standard" to be that a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]"[6] 466 U.S. at 694, 104 S.Ct. at 2068, and also defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* However, the court cautioned that in making such a determination of prejudice, a trial or appellate court must indulge the presumption that "the judge or jury acted according to law." *Id.*

Later in the opinion the *Strickland* court focused on general considerations for "adjudicating a claim of actual ineffectiveness of counsel[,]" 466 U.S. at 696, 104 S.Ct. at 2069, saying that no "mechanical rules" are intended. *Id.* However, the court also said,

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.*

Having carefully reviewed the claimed and identified deficiencies in trial counsel's performance, we conclude that trial counsel's reoccurring failure to make proper objections to the deluge of evidence of extraneous sexual offenses committed by the appellant against his stepchildren, other than the victim, which were admitted during the guilt-innocence phase, represents professionally unreasonable errors, adversely affecting appellant's defense in the case. Moreover, defense counsel, by introducing portions of Brenda McBride's written statement, enabled the State to introduce the entire contents of that damaging statement. Additionally, defense counsel's failure to object to the State's irrelevant and inadmissible evidence of the instability of the Doles family and the sordid conditions of the various homes occupied by appellant's family is another showing of professionally unreasonable error committed by trial counsel.

The State argues that (1) defense counsel made no objection to the evidence of extraneous sexual offenses allegedly committed by appellant in favor of his strategical choice to establish that the children's testimony, that is, the testimonies of the victim, Brenda McBride and Stephen Dosey, were of recent fabrication; (2) the written statement of Brenda McBride somehow aids that defensive theory that the children "fabricated their story"; and (3) the irrelevant evidence of the "filthy conditions" of the various Doles' family dwellings gave appellant a sound argument that Cleveland and other DHS case workers "coached the children" to falsely accuse appellant so that the children could be removed into foster care. We are not so persuaded.

It is true, however, as the State argues, that evidence of extraneous sexual offenses with the child victim are admissible in rebuttal of that defensive theory outlined above, if the evidence passes the "admissibility analysis of *Williams [v. State],* 662 S.W.2d 344." *See Boutwell v. State,* 719 S.W.2d 164, 178 (Tex.Cr.App.1985) (opinion on rehearing). That test requires the trial court to determine whether "the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." *Id.* at 174, 176. On the other hand, evidence of extraneous sexual offenses committed against children other than the child victim is inadmissible to establish a "proba-

---

**6.** That is, "[T]he factfinder would have had a reasonable doubt respecting guilt [or the severi- ty of the punishment assessed]." 466 U.S. at 695, 104 S.Ct. at 2068–2069.

 

bility" that the defendant committed the charged sexual offenses against the child victim. *Boutwell,* 719 S.W.2d at 174–179. The *Boutwell* court forcefully states that "propensity evidence" creates too great a danger "that juries would convict on ... evidence of this type" and that because a defendant had committed similar acts before, and was thus an "established sodomite[,] ... he should be convicted of the instant charge." *Id.* at 177.

In this case, the evidence of the extraneous offenses allegedly committed by appellant against Brenda, Stephen James Dosey, and "Fay's boys" was inadmissible under *Boutwell*'s analysis. That evidence demonstrated appellant's propensity to commit sexual assaults on young children, and however heinous those crimes are, evidence of their commission is not relevant to any defensive issue in this case. Trial counsel's failure to object to such evidence amounted to deficiencies which produced "a breakdown in the adversary process...." that rendered that process unreliable with respect to the punishment phase of the case. *Strickland,* 466 U.S. at 700–701, 104 S.Ct. at 2071. Those deficiencies, considered along with counsel's actions enabling the State to introduce Brenda's entire August 1986 written statement, containing a damaging reiteration of the extraneous sexual offenses against Brenda, Stephen James Dosey and Fay's boys, rendered the punishment phase fundamentally unfair. *Id.*

In the context of the entire record, we therefore conclude that appellant has shown that a reasonable probability exists that the punishment assessed by the jury in this case would have been different but for counsel's professional errors. Appellant's first point of error is sustained. *Strickland,* 466 U.S. at 695–696, 104 S.Ct. at 2068–2069.

Since we must reverse the judgment of conviction because of ineffective assistance of counsel at the guilt-innocence phase, this cause must be remanded for a new trial as to appellant's guilt as well. Tex.Code Crim.Proc.Ann. art. 44.29(a) (Vernon Supp. 1989).

The judgment is therefore reversed and the cause is remanded for a new trial.