No. 95,396

FLOYD S. BLEDSOE, *Appellant,* v. STATE OF KANSAS, *Appellee.*

(150 P.3d 868)

Opinion filed February 2, 2007.

*Richard Ney*, of Ney, Adams, & Sylvester, of Wichita, argued the cause and was on the brief for appellant.

*Jared S. Maag*, assistant attorney general, argued the cause, and *Kristafer R. Ailslieger*, assistant attorney general, and *Phill Kline*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Floyd Bledsoe was convicted of first-degree murder, aggravated kidnapping, and aggravated indecent liberties with a child; this court affirmed his convictions. See *State v. Bledsoe*, 272 Kan. 1350, 39 P.3d 38 (2002). This is an appeal from the district court's denial of his K.S.A. 60-1507 motion after a full evidentiary

hearing on his claims of prosecutorial misconduct and ineffective assistance of counsel.

## Factual and Procedural Background

At the time of her disappearance, the victim, Floyd Bledsoe's 14-year-old sister-in-law, C.A., was living with Floyd and his wife, Heidi, and their two sons, Cody and Christian, near Oskaloosa, Kansas.

At about 4:20 p.m. on Friday, November 5, 1999, the school bus dropped C.A. off at the Bledsoes' trailer home. A friend of C.A.'s stopped by about 5 p.m., but C.A. was not home.

A hunter testified that at about 5:30 p.m. he heard a woman scream and the words "please don't hurt me, somebody help, please don't hurt me" coming from near the dairy where Floyd worked. The hunter testified he did not hear any gunshots.

Tom Bledsoe, Floyd's brother, turned himself in to police on Sunday, November 7, and, through his attorney, led investigators to C.A.'s body on Monday, November 8. C.A. had been buried in a trash dump on the property of the Bledsoes' parents, also near Oskaloosa, where Tom lived. The body was under a pile of dirt, with several sheets of plywood and some clothing on top. C.A.'s shirt and bra were pulled up above her breasts. She had been shot once in the back of the head and three times in the chest.

Two days after his arrest, Tom made a statement to police, implicating Floyd. Tom said that while he was on his way to work on Saturday, November 6, he saw Floyd's car and stopped to talk. Tom testified that Floyd laid his head on the steering wheel and looked a little nervous. When Tom asked him what was wrong, Floyd said C.A. was dead. Tom said Floyd was mumbling, but he heard him say "accidentally shot her." Tom asked, "What?" Floyd said, "She's dead, accidentally shot her." Tom testified that he asked Floyd why she was dead. Floyd shook his head and shrugged his shoulders. Tom also said that he asked Floyd whether he had raped C.A. or sexually abused her. Floyd responded, "Yes, no, I don't know." Floyd told Tom that he recalled her shirt and bra were above her breasts and that he used Tom's pistol to shoot C.A. Tom said he reached behind the truck seat and felt his pistol in the case. He

said Floyd knew he kept a gun in his truck. Tom testified that Floyd told him he shot C.A. once in the back of the head and twice in the chest. When Tom asked where C.A. was, Floyd told him she was in the trash dump behind their parents' house underneath plywood, trash, and dirt.

Tom also said that Floyd had told him not to tell anyone, that Tom should take the blame, and that if he did not, Floyd would tell people about Tom's past. At trial, Tom acknowledged that Floyd had threatened him in this way in the past to get what he wanted. Tom thought Floyd would reveal to members of his church that he had tried to have sex with a dog, had been caught with dirty magazines, and had played with himself while watching dirty movies.

Tom testified at trial that when he got off work on Saturday night, he went home to "make sure if what [Floyd] told [him] was true." He had driven out to the trash dump and looked around; he had not seen C.A.'s body but had noticed that items in the dump and dirt had been displaced. Tom then went home and put his gun in his dresser drawer. He turned himself in the next day after leaving messages on the answering machine of the minister at his church. In the messages, Tom said he was sorry and would "pay for the rest of [his] life for what [he had] done." He did not say that he had killed C.A. However, Tom told officers he had shot C.A.

Tom testified at Floyd's trial that he turned himself in for something he did not do because he did not want people to know about his past. He said he also thought about wanting Floyd's children to grow up with a father in the home. A day or two after his arrest, Tom was "ashamed" about lying and talked with police again, implicating Floyd. He testified that he could not live with himself because Floyd had told him where C.A.'s body was.

Officers interviewed the brothers together and eventually arrested Floyd and released Tom. Detective Randy Carreno testified at trial that when the brothers were in the room together, Tom stated that "[Tom] wanted [the officer] to know the truth, he wanted everybody to know the truth, and that he wasn't going to hide the truth anymore, and . . . the information that he gave

[the officer] was that it was Floyd Bledsoe that killed [C.A.]." 272 Kan. at 1364.

Sheriff Roy Dunnaway testified that, during the search effort, after C.A. disappeared and before her body was discovered, Floyd asked him: "She's dead, isn't she? Do you know if she's dead?" When asked if these statements were consistent with the usual reaction in the disappearance of a 14-year-old, possibly a runaway case, Dunnaway said, "I think most people put them thoughts out of their mind and still have hope that she was going to be found, which I had hopes that she would be found, be, be alright. [Floyd's reaction] to me is unusual, yes."

Detective Troy Frost testified regarding Floyd's interrogation. He said that Floyd "got real emotional" and said that he had stopped at the trailer the afternoon C.A. disappeared. Later, and on a number of other occasions, Floyd denied having stopped by the trailer that day. Floyd also told Frost that he loved C.A. When the prosecutor asked, Frost said he believed Floyd had gone to the trailer and that Floyd was genuine about his feelings for C.A.

Detective Kirk Vernon testified that C.A.'s mother, Tommie Arfmann, told Vernon she had gone to look for Floyd at the dairy where he worked at about midnight on Friday, the night C.A. disappeared, and that Floyd was not there. On cross-examination, the prosecutor suggested that Arfmann told other law enforcement officers that it was much earlier than midnight when she was at the dairy.

The murder weapon, a 9 mm semiautomatic pistol found in Tom's bedroom, belonged to Tom. He had purchased the gun about 2 weeks before the murder. Shells matching those fired from Tom's gun were found in his bedroom. No fingerprints were found on the gun.

Dr. Erik Mitchell testified concerning the forensic evidence admitted at trial: (1) The shot fired to the back of C.A.'s head was a contact shot and was not fired at the location where she was found; (2) she had been placed in the burial site and then shot in the chest; and (3) based on the position of the shots fired in her chest in relation to her clothing, her shirt was raised up before the shots were fired. Mitchell opined that, based on the position and folds

of C.A.'s shirt and bra, it appeared that her clothes had been intentionally lifted rather than moved up by post-mortem dragging or sliding of her body. 272 Kan. at 1362.

A safety plan instituted by the district court required Floyd to wear a bulletproof vest under his clothes throughout the trial.

The defense theory of the case was that Tom committed the murder, and testimony centered on the alibis of Floyd and Tom during the time between C.A.'s disappearance and the discovery of her body. Testimony also focused on the relationship each of the brothers had with C.A., and their various statements to police.

Testimony revealed that Floyd loved C.A., that he had considered pursuing a sexual liaison with her, and that he wanted to know what her plans were going to be when Floyd and his wife divorced, which they were in the process of doing. Testimony from Rosa Bolinger and Brandi Wampler suggested that C.A. was afraid to be alone at night at the trailer with Floyd.

Testimony at trial also included recitations of statements made by Floyd's 2-year-old son, Cody, which implicated Tom and Floyd alternatively. Cody did not testify at trial. His statements developed in the following manner:

Floyd's wife, Heidi, dropped her sons off at a babysitter's house on Friday afternoon, November 5. The babysitter watched the boys until 12:45 a.m., when Floyd picked them up. Floyd brought them back to the babysitter around 2:45 a.m., and he returned at 8:30 a.m. on Saturday morning. On Monday night, after C.A.'s body was discovered, Cody told Heidi that Tom had killed C.A. Bolinger, who attended the same church as C.A., testified on cross-examination by defense counsel that she heard Cody telling a story about Tom shooting C.A. Bolinger told police that on Monday, November 8, Cody said: "Tom shot [C.A.], boom, boom, boom, boom, and dumped her in the water. Tom put his, Cody's, blanket around [C.A.] and also put [C.A.'s] blanket around her. . . . Tom closed [C.A.'s] eyes and he kissed her cheeks." Bolinger said that sometime after that, but before the body was discovered, Cody first told her Tom put [C.A.] in a dump truck, but later Cody said that it was not a dump truck but a dump. On redirect, Bolinger indicated that, based on her perceptions, she did not think that someone told

Cody these things, she believed he had actually seen them. Heidi also testified about Cody's statements. Called by the State, she testified that she and Bolinger witnessed Cody describe Tom shooting C.A., wrapping her in a blanket, and putting her in the dump. A few days after Floyd's arrest, however, according to Heidi, Cody's statements changed; Cody started saying "Daddy" killed C.A.

Floyd was convicted of first-degree murder, aggravated kidnapping, and aggravated indecent liberties with a child. He filed a direct appeal of his convictions, challenging the sufficiency of the evidence, the admission of Cody's hearsay statements as a violation of the Confrontation Clause, and the admission of certain testimony of Carreno as vouching for Tom's credibility. This court affirmed the convictions, concluding that, although the evidence was entirely circumstantial, it was sufficient to support the convictions. We further held that, because the defense first introduced them into evidence, Cody's hearsay statements did not violate the Confrontation Clause. We also held that the officer was not "vouching for Tom's credibility." 272 Kan. at 1364.

In January 2003, Floyd filed the petition underlying this appeal, alleging ineffective assistance of trial counsel. Depositions were taken of John Kurth, Floyd's appointed trial counsel, and Jimmie Vanderbilt, the county prosecutor on the case.

On October 22, 2004, the district court held a full evidentiary hearing at which six witnesses testified: Dr. Marilyn Hutchinson, a child psychologist; Jean K. Gilles Phillips, a University of Kansas Law School criminal law professor and Director of the Defender Project clinic; Tammy Dressler Arfmann, the victim's sister-in-law; Kurth; Vanderbilt; and Floyd.

On March 9, 2005, Floyd moved to amend his petition in order to include the claim of prosecutorial misconduct. The district court granted his motion.

On September 28, 2005, the district court denied Floyd's K.S.A. 60-1507 motion in a memorandum opinion, finding that his counsel was effective and sufficient; that counsel's representation was reasonable considering the circumstances; and that counsel's representation did not prejudice Floyd's right to a defense and a fair

trial. The court also concluded that the issue of prosecutorial misconduct was waived because it was not raised at trial or on Floyd's direct appeal, and that there were no exceptional circumstances excusing Floyd's failure to raise the issue earlier.

## Standard of Review

Our standard of review on an appeal of a K.S.A. 60-1507 motion after an evidentiary hearing in the district court is well-established and often cited. We are charged with determining whether the factual findings of the district court are supported by substantial competent evidence and whether those findings are sufficient to support the district court's conclusions of law. *Graham v. State,* 263 Kan. 742, 753, 952 P.2d 1266 (1998). Substantial evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Sampson v. Sampson,* 267 Kan. 175, 181, 975 P.2d 1211 (1999). We must accept as true the evidence and all inferences drawn from the evidence that tend to support the findings of the district judge. *Graham,* 263 Kan. at 753-54.

## Prosecutorial Misconduct

In his amended 60-1507 petition, Floyd alleges that the prosecutor committed misconduct by submitting incompetent evidence in the form of Cody's statements, and that this misconduct prejudiced Floyd's constitutional right to a fair trial.

Prosecutorial misconduct may be properly raised on direct appeal, despite lack of contemporaneous objection at trial. See *State v. Dixon,* 279 Kan. 563, 581, 112 P.3d 883 (2005); *State v. Mann,* 274 Kan. 670, 688, 56 P.3d 212 (2002). It is not properly raised in a collateral proceeding under K.S.A. 60-1507 unless it affected a constitutional right and there is a showing of exceptional circumstances excusing the failure to appeal on that issue. Supreme Court Rule 183(c) (2006 Kan. Ct. R. Annot. 227); *Johnson v. State,* 271 Kan. 534, 535, 24 P.3d 92 (2001). As a practical matter, a 60-1507 movant can overcome a procedural default, *i.e.,* a failure to raise an issue at trial or on direct appeal, and demonstrate exceptional circumstances by persuading us that there was (1) ineffective as-

sistance of trial counsel in failing to object regarding an issue; (2) ineffective assistance of direct appeal counsel in failing to raise the issue; or (3) newly discovered evidence or an unforeseeable change in circumstances or constitutional law unknown to counsel and the movant at the time of trial and direct appeal.

Floyd relies on the third method. Although he alleges that Kurth was ineffective, he does not base his ineffectiveness argument on Kurth's failure to allege prosecutorial misconduct at trial. He does not challenge the performance of his counsel on direct appeal. Instead, he argues that exceptional circumstances exist because the prosecutor's misconduct was unknown until the 60-1507 hearing. Specifically, Floyd points to statements by the prosecutor, Jimmie Vanderbilt, that the prosecutor believed Cody to be incompetent to testify and the "Daddy did it" statement to be unreliable. Vanderbilt had been present when a police officer attempted to interview Cody. He testified about his resulting impression: "[B]ased on what I observed I didn't believe that I could successfully sit the boy down on a stand and ask him questions and get him to respond appropriately." Given this impression, Floyd argues, Vanderbilt's presentation of Cody's hearsay statements through the testimony of Bolinger and Heidi was reversible prosecutorial misconduct.

The district court concluded that there were no exceptional circumstances requiring review of this issue. See *State v. Neer*, 247 Kan. 137, 140-41, 795 P.2d 362 (1990). We agree. The deposition of Floyd's trial counsel, Kurth, also was admitted into evidence at the 60-1507 hearing. In it, Kurth testified that he also had concerns at the time of trial about the reliability of Cody's statements. He nevertheless sought to introduce the "Tom did it" statement. In this situation, the fact that Floyd learned for the first time at the 60-1507 hearing that the prosecutor shared the concerns of his own counsel and nevertheless introduced Cody's statements does not qualify as an exceptional circumstance excusing failure to raise the prosecutorial misconduct issue earlier. It is plain that Kurth did not raise the issue of Vanderbilt's conduct earlier not because it was unknown to him but because he was engaging in the same conduct.

*Ineffective Assistance of Counsel*

The Sixth Amendment right to counsel is the right to effective assistance of counsel. *Chamberlain v. State,* 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting standards of *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh. denied* 467 U.S. 1267 [1984]).

To support a claim of ineffective assistance of counsel, it is incumbent upon a defendant to prove that (1) counsel's performance was deficient, and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *State v. Gleason,* 277 Kan. 624, 643, 88 P.3d 218 (2004); see also *State v. Davis,* 277 Kan. 309, 314, 85 P.3d 1164 (2003); *State v. Orr,* 262 Kan. 312, 317, 940 P.2d 42 (1997); *State v. Rice,* 261 Kan. 567, 598-603, 932 P.2d 981 (1997) (quoting *Strickland,* 466 U.S. at 687). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Chamberlain,* 236 Kan. at 656; *Gleason,* 277 Kan. at 643.

The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Gleason,* 277 Kan. at 644.

Once a defendant has established counsel's deficient performance, the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffec-

tiveness claim must consider the totality of the evidence before the judge or jury. 277 Kan. at 644.

We review de novo the district court's analysis of the two prongs of the ineffective assistance of counsel inquiry, because it involves mixed questions of law and fact. *Gleason*, 277 Kan. at 644-45; *Davis*, 277 Kan. 309, Syl. ¶ 4.

Floyd points to what he regards as 23 specific failings by Kurth. These fall into six general categories: failings related to Cody's statements; failing to object to other evidence, to the prosecutor's closing argument, and to the requirement that Floyd wear a bulletproof vest during trial; failing to call witnesses and admit other evidence; pretrial procedural failings; failing to conduct a meaningful voir dire; and cumulative error. We address each in turn. We ultimately conclude that Kurth's performance was constitutionally deficient. His professed "strategy" in introducing an exculpatory but nevertheless unreliable and incompetent hearsay statement of a 2-year old, which opened the door to the child's damaging hearsay statement, was objectively unreasonable. However, because we cannot say that the outcome would have been different had Cody's statements been excluded and Kurth's other errors not occurred, and because our confidence in the jury's verdict is not undermined, we conclude that there was no prejudice.

## Failings Related to Cody's Statements

Floyd urges us to recognize five errors of his counsel with regard to Cody's statements: (1) failure to obtain Floyd's consent to introduce Cody's statements; (2) failure to request examination of Cody to determine his competence as witness; (3) failure to present expert testimony concerning child suggestibility and the reliability of Cody's statements; (4) failure to object to the statements as hearsay; and (5) failure to object to the prosecutor's questioning concerning the statements as evidence that Cody was an eyewitness.

Kurth testified at the 60-1507 hearing that he was aware of Cody's "Daddy did it" statement, weighed the risk, and thought it would be to Floyd's benefit to have the "Tom did it" statement come in, even if that meant the "Daddy did it" statement also would come in. It is for this reason that he did not object to the

prosecution's use of the "Daddy did it" statement. Kurth had previously determined he was "going to try to get [the "Tom did it" statements] in through [Heidi's testimony]," thought they would be admissible, and thought any attendant risk would be "worth it."

Floyd first argues that Kurth was ineffective for failing to secure his consent to the admission of Cody's statements, and that this failure violated his right to confront the witnesses against him. The admissibility of Cody's statements in relation to the Confrontation Clause was addressed by this court in Floyd's direct appeal; we determined there was no violation where the defense put these statements into evidence. That question need not be addressed again. We need only address the constitutional necessity or lack of necessity for Floyd's consent.

Kurth testified at the 60-1507 hearing that he talked to Floyd about Cody's inconsistent statements, and that he informed Floyd of his strategic decision that it was more worthwhile to get the "Tom did it" statement in than to keep the "Daddy did it" statement out. Floyd, on the other hand, testified that he did not know his son had incriminated him until the prosecutor's opening statement. He also testified that Kurth never sat down with him to explain the ramifications of admitting Cody's statement, and that, if Kurth had told him about the "Daddy did it" statement, he would not have agreed to admission of the "Tom did it" statement.

Regardless, certain decisions relating to the conduct of a criminal case are ultimately for the accused: (1) what plea to enter; (2) whether to waive a jury trial; and (3) whether to testify. Others are ultimately for defense counsel. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client. See *State v. Ames*, 222 Kan. 88, 100, 563 P.2d 1034 (1977). Kurth was not required to obtain Floyd's consent before introducing Cody's statement that "Tom did it."

Floyd's next two arguments are intertwined. He asserts that Kurth was required to hire an expert child psychologist and challenge Cody's competence under K.S.A. 60-417 because, had the

district court found Cody was "incapable of expressing himself" or incapable of understanding his duty to tell the truth, "his highly prejudicial 'Daddy did it' statements would not have been able to come into evidence."

Kurth did not hire a psychologist, request to interview Cody, or otherwise attempt to determine his competence to testify, because Kurth had no intention of calling Cody as a witness. On the contrary, Kurth testified that it was his intention to have Bolinger or Heidi relate Cody's statement about Tom, and that he did not even consider consulting a child psychologist. It is obvious that, had Kurth challenged Cody's competence in regard to the "Daddy did it" statement, he would have undermined his ability to get the "Tom did it" statement into evidence. As discussed previously, the decision to admit the statement against Tom was part of Kurth's "strategy." Putting aside for the moment the reasonableness of that "strategy" overall, once that "strategy" had been selected, Kurth did not act unreasonably in failing to seek or introduce testimony that might undermine the impact of the "Tom did it" statement.

Finally, with regard to Cody's statements, Floyd cites as error Kurth's failure to object to questioning that elicited Bolinger's and Heidi's testimony that Cody was a probable eyewitness to the crime. Kurth testified that he had no reason for not objecting, and that he didn't foresee the prosecutor capitalizing on this suggestion that Cody was present when C.A. was killed by introducing evidence that Cody could only have been with his dad. Again, putting aside for the moment the reasonableness of Kurth's "strategy" regarding Cody's statements, his failure to object to this questioning does not constitute error. Having made the decision to admit Cody's statements that Tom did it, Kurth had no reason to object to the prosecutor's further inquiry implying Cody was an eyewitness to Tom's crime.

We now return to the question of whether Kurth's "strategy" concerning Cody's statements was objectively reasonable. See *Ferguson v. State*, 276 Kan. 428, 446, 78 P.3d 40 (2003). It is true, as the State reminds us, that " '[w]here experienced attorneys might disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective counsel.' " *Crease v. State*,

252 Kan. 326, 338, 845 P.2d 27 (1992) (quoting *State v. Kandig*, 233 Kan. 890, 896, 666 P.2d 684 [1983]). However, even if each of Kurth's actions was logical and consistent with his chosen strategy, the strategy itself must still pass muster.

Phillips testified at the 60-1507 hearing that the failure of defense counsel to object to the "Daddy did it" statement, even if that meant being unable to present the "Tom did it" statement, fell below the due care required of a reasonably competent defense attorney, and, in her opinion, was "a huge mistake." Floyd urges us to agree with Phillips that Kurth's performance falls short when measured against the yardstick of objective reasonableness. See *Gleason*, 277 Kan. at 644; see also *Roe v. Flores-Ortega*, 528 U.S. 470, 145 L. Ed. 2d 985, 120 S. Ct. 1029 (2000).

According to Kurth, Cody's initial statement that "Tom did it" was an integral element of proof that Tom, rather than Floyd, committed the crime. Kurth testified at the 60-1507 hearing that the decision not to object to Cody's later statement that "Daddy did it" was a risk he weighed, and that he concluded the risk was worth taking.

Considering, as we must, all of the circumstances at the time and granting Kurth all the deference he is due, we nevertheless conclude that his strategy regarding Cody's statements was objectively unreasonable. Cody was only 2 years old when he implicated first his uncle, then his father. In addition, even without Cody's statements, there was considerable evidence pointing to Tom as the perpetrator: His gun was the murder weapon; he had purchased the bullets; he initially confessed to having killed C.A.; and he led police to the body, which was buried behind the house where he lived. Kurth could have relied on this evidence to support the defense theory. Instead, he doggedly pursued a strategy that he knew would reveal that Floyd's own son eventually pointed his small finger at Floyd. We agree with Phillips that this strategy was "a huge mistake," particularly when it included no plan to mitigate Cody's damaging "Daddy did it" statement. Such mitigation might have taken the form of expert testimony on the likelihood that Cody's original statement implicating Tom was more accurate than his later statement implicating Floyd, perhaps because the latter

was a product of hearing others discuss his father's arrest. Had such testimony been introduced, Kurth could have argued this implication in closing, particularly after the State made its closing argument suggesting that Cody was an eyewitness who originally said "Tom did it" because his father told him to. But Kurth did none of these things. He put the exculpatory statement in front of the jury, knowing that the inculpatory statement would follow, and did nothing to explain the difference or its significance. Under these circumstances, the mere invocation of the word "strategy" does not insulate Kurth's performance from constitutional criticism. Compare *Mullins v. State*, 30 Kan. App. 2d 711, 717-18, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002) (counsel cannot insulate ineffective assistance by labeling it strategy; where outcome of trial depended on child sexual abuse victim's statements, failure to investigate, employ expert to attack testimony constituted deficient performance).

Having determined that Kurth's performance was deficient in regard to introduction of Cody's statements, we now discuss Floyd's other assertions of error on Kurth's part.

### *Failure to Object to Other Evidence*
#### James Bolinger's Testimony

James Bolinger and Catherine Bledsoe testified that Tom attended church regularly. James further testified that, in his opinion, Tom was "a good man," whom no one spoke negatively about, who obeyed the church's teachings about the separation of men and women, and who was not the kind of man who would "chase women" or "go to bars."

Floyd argues that this testimony was an inadmissible endorsement of Tom's religion or godliness, that the witnesses impermissibly vouched for Tom's credibility, and that Kurth's failure to object constituted deficient performance.

We disagree. Tom's credibility was at issue in the case regardless of this testimony. As the district court noted, although Kurth did not provide a strategic reason for his failure to object to this particular testimony, he did bring in evidence to counter it: evidence that Tom had tried to have sex with a dog, that he viewed porno-

graphic films and magazines, and that he had "messed with" young kids one time at a church function.

In addition, evidence of Tom's church-going habits was relevant, as it tended to establish his alibi and the nature of his relationship with C.A., who also was a regularly attending member of the church. C.A. did not show up for a church meeting the Friday night of her disappearance, and Tom did. Kurth's failure to object does not constitute constitutionally deficient representation.

Carreno's Testimony

Floyd next alleges Kurth was ineffective in failing to object to Carreno's testimony concerning Tom's statement to the detective about telling "the truth." We already addressed this testimony in Floyd's direct appeal and determined that it was not objectionable because Carreno did not vouch for Tom's credibility. The context of the testimony demonstrates the officer was referring to "truth" according to Tom. Thus the jury was presented with Tom's version of what happened and was left to weigh his credibility, exactly as it was expected to do.

Dunnaway's Testimony

Floyd also cites Kurth's failure to object to the Sheriff Dunnaway's opinion regarding whether Tom's statement was a "confession." Although it is not perfectly clear to which testimony Floyd refers, the record reveals that Kurth *did* object to the prosecutor's initial questioning of Dunnaway regarding Tom's messages on the Bolingers' answering machine. The judge sustained the objection as it pertained to Tom's state of mind but permitted Dunnaway to testify that he did not consider the messages a confession because it "just told me where the body was at" and not that Tom "had done anything." Dunnaway also testified that a few days after Tom was arrested, Dunnaway began to have a problem with the arrest because Tom's story "wasn't panning out."

Floyd argues that this testimony was impermissible, and cites our line of *Elnicki* cases: *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005); *State v. Plaskett*, 271 Kan. 995, 27 P.3d 890 (2001); and *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 (1986). He relies

on these decisions for the proposition that a witness may not express an opinion concerning the credibility of another witness. Of course, this is correct. But, there was nothing objectionable about Dunnaway's testimony on this basis. He was merely describing the statements and his reaction to them, not stating an opinion about whether they were worthy of belief. In addition, Kurth *did* object to portions of Dunnaway's testimony. His representation on this point is not deficient.

Dunnaway also testified that, after C.A. disappeared and before her body was discovered, Floyd made statements to him: "She's dead isn't she? Do you know if she's dead?" When asked if these statements were consistent with the usual reaction of a person concerned with the disappearance of a 14-year-old, possibly a runaway, Dunnaway said, "I think most people put them thoughts out of their mind and still have hope that she was going to be found, which I had hopes that she would be found, be, be all right [*sic*]. This to me is unusual, yes."

The district court concluded that this statement was not objectionable, because it was admissible opinion testimony under K.S.A. 60-456. This statement also helped to explain the course of the investigation, which turned from Tom to Floyd. In addition, as lay-witness testimony, the statement was rationally based on the sheriff's perception; if he is regarded as an expert, it was based on data known to him and on his experience as a longtime law enforcement officer. See K.S.A. 60-456(b). We agree with the district court that Kurth's failure to object to this admissible testimony does not constitute ineffective assistance.

Frost's Testimony

Detective Troy Frost testified that during an interview with Floyd at the police station, Floyd "got real emotional" and said that he had stopped at the trailer the afternoon C.A. disappeared. Later, and on a number of other occasions, Floyd denied having stopped by the trailer that day. Floyd also told Frost that he loved C.A. The prosecutor asked Frost: "When [Petitioner] said that he had gone to the trailer that day did you believe him?" Frost said yes. The prosecutor then asked: "What [Petitioner] was indicating to you

though your questions and his statement how he felt about her was, you think he was being genuine?" Frost responded: "Oh yes."

Kurth did not object to this questioning and testified at the 60-1507 hearing that he could not recall any strategic reason for not doing so. Floyd is correct; this was objectionable testimony that invaded the province of the jury.

## Suppression Issue

Before trial, Kurth filed a motion to suppress certain statements made by Floyd to police concerning his interest in C.A. At trial, the State introduced the testimony of Sergeant Robert Poppa, who testified that he read Floyd his *Miranda* rights and that he witnessed Floyd's written waiver. Kurth stipulated that Floyd was *Mirandized*. Vanderbilt then questioned Poppa about Floyd's statements; Floyd had said he considered pursuing a sexual liaison with C.A.

Floyd argues that Kurth's stipulation constituted deficient representation because it prevented Floyd from raising the suppression issue on appeal. Kurth recalled that he stipulated to it because he knew Floyd had been properly *Mirandized*. Kurth said that he didn't think there was a reason to object to the statements because they were not confessions of guilt.

Floyd has not demonstrated that it was deficient for Kurth to act in this way. It is not objectively unreasonable that Kurth would avoid a frivolous objection and instead challenge the substance of the statements and minimize their import on cross-examination, which is what he did. The trial court's findings are substantially supported by the record, and its conclusion that Kurth was not ineffective is sufficiently based on those findings.

## Victim's Hearsay Statements

Rosa Bolinger and Brandi Wampler testified that C.A. told them she was afraid to be alone at night at the trailer with Floyd. Defense counsel did not object to these hearsay statements. He testified that he did not recall a specific strategy behind his failure to object, but we note that Kurth presented evidence at trial to contradict

them. The defense introduced Heidi's testimony that Floyd treated C.A. like a sister and cared for her very much.

Floyd fails to show that Kurth's failure to object constituted deficient representation or prejudiced him. Moreover, Bolinger's and Wampler's statements were not inadmissible hearsay; they were statements made by an unavailable declarant pursuant to K.S.A. 60-459(g)(3). They pertained to C.A.'s recent perception made in good faith and with no reason to falsify, see K.S.A. 60-460(d), and her then existing state of mind, see K.S.A. 60-460(l). The district judge concluded that any objection would have been overruled. This decision is substantially supported by the record and legally sound.

## Mitchell's Testimony

Floyd next argues that Dr. Erik Mitchell was not qualified to opine regarding C.A.'s shirt, and that Kurth's failure to object to Mitchell's statement that C.A.'s shirt and bra probably were pulled up intentionally rather than accidently by dragging or sliding her body constituted ineffective assistance. This argument lacks merit.

First, Mitchell is a forensic pathologist, qualified to give testimony regarding his examination of evidence relative to a dead body, including his conclusions concerning cause of a death and circumstances surrounding a death. His testimony concerning the physical evidence of abrasions indicating dragging, the location of the clothing on the body, and the placement of the gunshot holes led him to believe the placement of the clothing was not consistent with dragging, but rather with intentional positioning. This testimony was not, as Floyd argues, outside the special knowledge, skill, expertise, or training of this witness, see K.S.A. 60-456, and it is unlikely that an objection would have been sustained.

## Arfmann's Statements

Floyd also faults Kurth's performance regarding his admission of Detective Kirk Vernon's testimony about statements he had taken from C.A.'s mother, Tommie Arfmann. Arfmann told Vernon that she had gone to look for Floyd on Friday, the night C.A. dis-

appeared, and that Floyd was not at the dairy where he worked. Arfmann later found him at his home.

On cross-examination, the prosecutor asked Vernon if he had talked to Arfmann since that time and if he was aware that Arfmann had told other law enforcement officers that it was actually "much earlier" than midnight when she went by the dairy. Vernon was not aware of this. Kurth did not object to this questioning.

Floyd argues that Kurth was deficient for failing to object because Arfmann's later statements were not based on any facts in evidence at trial, and constituted inadmissible hearsay.

Kurth testified in his deposition that he could not recall why he did not object but that he remembered neither he nor the prosecutor wanted to call Arfmann to testify. The State persuasively suggests that Arfmann's statements were not hearsay because they were not offered to prove the truth of the matter asserted. The prosecutor merely inquired whether the detective was aware Arfmann had changed her story, in order to impeach the detective. Moreover, as long as the prosecutor had a good-faith basis for believing the asserted matter to be true, there was nothing objectionable about his questioning. Arfmann's son—C.A.'s brother—had previously testified that he was with his mother when they drove to the dairy about 11 p.m. that night. An objection probably would have been overruled.

## Catherine Bledsoe's Testimony

At trial, Catherine Bledsoe related a conversation she had with Floyd shortly after he was arrested and Tom was released, in which she and Floyd agreed that Tom did not kill C.A. Floyd argues that this was inadmissible, damaging, prejudicial testimony concerning Floyd's mother's opinion of Tom's culpability. We agree with the district court's determination that Floyd fails to meet his burden to show that Kurth's representation was constitutionally deficient on this point.

## Prosecutor's Closing Argument

Floyd also claims that Kurth was ineffective for failing to object to Vanderbilt's closing argument because Vanderbilt repeatedly

"made improper arguments and argued as fact matters not proven by the evidence." We agree that several of the prosecutor's statements are troubling.

At one point, the prosecutor said, "The physical evidence shows that Tom didn't do it." This statement was unsupported. There was no physical evidence produced at trial that excluded Tom as the killer. On the contrary, certain physical evidence linked Tom to the murder. Tom's gun was the murder weapon, and the bullets that killed C.A. were purchased by him.

The prosecutor also stated:

"I can't tell you when [Floyd] did it. But I can tell you who was there. He wasn't alone. We know there [were] at least three people there, him and [C.A.], and he brought his son. His son sat in the vehicle and he watched Floyd Scott Bledsoe put the gun to the back of his aunt's head and [pull] the trigger.

"Floyd takes care of the body, gets back in the car, Cody says, 'You killed Aunt [C.A.]' . . . When Floyd Scott Bledsoe convinced his two-year-old son to say Tom did it, as soon as that powerful influence of his father was out of his presence he was comfortable with telling the truth . . . when he goes to [C.A.]'s grave he explains to her, because he was there . . . . 'Aunt [C.A.], I didn't kill you, my dad did.' "

Attributing a "Daddy did it" statement to Cody at C.A.'s graveside was unsupported by the evidence. Heidi testified that at C.A.'s graveside Cody said: "Aunt [C.A.], I didn't shoot you, it wasn't me."

The prosecutor also argued that "Mom, Floyd, and Cody explained to you it was Floyd. Tom couldn't have done it. . . . [H]is wife explains to you . . . that Cody was there. . . . A psychologist, based on the information she said, Cody was there. There's only one way Cody could have been there . . . He was with [his father]." Again, a part of this statement was unsupported. No child psychologist testified that Cody was at the crime scene; no expert testimony regarding Cody was admitted at all.

These statements were outside the wide latitude given a prosecutor in discussing the evidence and thus could have been subject to a sustainable objection. See *State v. Dixon*, 279 Kan. 563, 590-91, 112 P.3d 883 (2005); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004). Lacking any strategic explanation in the record for

Kurth's failure to object, and given the repeated nature of the prosecutor's behavior, we agree that Kurth was ineffective by failing to object to these statements.

Bulletproof Vest

Floyd next takes issue with Kurth's failure to challenge the district court's requirement that Floyd wear a bulletproof vest for his own safety. Floyd testified at the 60-1507 hearing that the vest was bulky and obvious. Kurth agreed that the vest was somewhat bulky but testified that the question of whether it was necessary to have Floyd wear the vest in front of the jury "didn't cross [his] mind."

Floyd argues that requiring him to wear the vest violated his right to a fair trial, because of its prejudicial effect on the jury, and that Kurth's failure to object constituted deficient performance. He analogizes his situation to that discussed in *Illinois v. Allen*, 397 U.S. 337, 344, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970), where the Supreme Court questioned the fundamental fairness of hypothetical proceedings in which a defendant would be shackled or gagged.

The analogy is unpersuasive. This court has held that the use of restraint devices creates the distinct possibility of communicating to the jury that a defendant is dangerous, and can compromise the presumption of innocence, but is not inevitably prejudicial. See, *e.g., State v. Davidson*, 264 Kan. 44, 49-50, 954 P.2d 702 (1998) (prejudicial error where, in reference to defendant's leg brace, judge told jury that sheriff wanted to prevent individual in custody from escaping); *State v. Powell*, 274 Kan. 618, 620-23, 56 P.3d 189 (2002) (no abuse of discretion to require defendant to wear stun belt; no prejudice shown). Here, the purpose was not to restrain the defendant, but to protect him. The record indicates that at least two individuals, including the victim's mother, had made threats against defendant. Kurth had no reason to think that his client's wearing of a bulletproof vest would be prejudicial, or even objectionable. Floyd fails to establish that the lack of an objection by Kurth was objectively unreasonable.

*Failure to Call Witnesses and Admit Other Evidence*

Floyd also argues that Kurth was ineffective because he failed to call several witnesses on Floyd's behalf. Decisions on whether

to call a certain witness are strategic and tactical and generally within the exclusive province of the attorney. See *State v. Nunn,* 247 Kan. 576, 581, 802 P.2d 547 (1990); *Winter v. State,* 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). Again, the defense strategy in this case was to direct blame at Tom. We have thoroughly reviewed the record on the testimony of the witnesses Floyd suggests were necessary. We conclude that the testimony would have been either inconclusive, cumulative, or, worse, would have confused the jury and obscured the theory of the defense. Kurth's failure to call the numerous witnesses cited by Floyd did not constitute deficient performance.

Floyd also cites as deficient performance Kurth's failure to introduce an answering machine tape of Tom's messages. However, the State introduced a written transcript of the messages, and Tom read the transcript at trial. Kurth also presented testimony about the tape's contents through James Bolinger. The tape itself would have been cumulative.

### Pretrial Procedural Failures

Floyd alleges that Kurth failed to properly prepare a motion to suppress; failed to accept a continuance offered by the court; and failed to request a change of venue, and that these failures constituted ineffective assistance. We have reviewed the allegations and the record and conclude that Floyd's arguments are without merit. We see no potential for success on a suppression motion or on a motion to change venue. See *State v. Jorrick,* 269 Kan. 72, 76, 4 P.3d 610 (2000). And Floyd has not demonstrated the necessity of a continuance; the State's endorsement of known witnesses did not require it.

### Voir Dire

Floyd suggests Kurth failed to conduct a meaningful voir dire, primarily because Kurth's voir dire was so short. As Floyd notes, it "made up less than 10 pages of trial transcript." Floyd also argues that Kurth erred in complimenting law enforcement and made one other particularly damaging remark during voir dire.

The record reveals that the prosecutor conducted a thorough voir dire; Kurth participated, made inquiries, made appropriate peremptory challenges, and even singled out a couple of potential jurors to. question in depth. Floyd fails to show that a biased or prejudiced juror was selected or that there was any member of the panel who should have been excused. See *State v. Ji*, 251 Kan. 3, 13, 832 P.2d 1176 (1992). Under these circumstances, mere length of Kurth's interaction with venire members does not tell the tale. We do not regard the time he took to complete it as insufficient. We also are not bothered by Kurth's compliment directed at the police of Jefferson County and the prosecutor. We are confident that these professional courtesies are perceived as exactly that, and no more.

That being said, we have a less positive view of the comparison Kurth drew between Floyd's case and the Susan Smith case. Near the conclusion of his voir dire, Kurth stated:

"Everybody remember the Susan Smith case? I know it's been a few years. Anybody recognize that name? Little gal that finally fessed up to drowning her little children? Anybody remember that now few years ago? Remember how she went on TV in front of everybody saying, asking where her children were and what happened and it was emotional, just like this one will be, and you wanted to believe her because you couldn't believe that somebody would do that to her own children. Ladies and gentlemen, I'm going to tell you that's the same kind of situation we have here. Don't decide this case until you've heard it all, because you're definitely going to hear two sides."

The Smith case gained worldwide attention shortly after it developed, because Smith initially reported to police that she had been carjacked by an African-American man who drove away with her sons still in her car. Smith made tearful pleas on television for the rescue and return of her children. Nine days later, following an intensive, heavily publicized investigation and nationwide search, Smith eventually confessed to letting her car roll into a nearby lake, drowning her children inside.

The State argues that Kurth was "simply . . . explain[ing] to the jury, using a concrete example, the importance of not rendering a decision until they heard all of the evidence" and that this was a tactical decision and not unreasonable. We agree that this was un-

doubtedly Kurth's intention, but we view his execution as, at least, clumsy. Floyd testified at the 60-1507 hearing that he had gone on television while police were still searching for C.A. He made a statement about her disappearance, asked for help, and requested that anyone with information contact law enforcement. Given this parallel to the Smith case, Floyd was shocked by Kurth's reference to the Smith case, because "when she went on TV . . . [s]he had actually killed her children." Floyd argues that the selection of an impartial panel during voir dire is "perhaps the most important part of a criminal trial" and that counsel's comparison of his case to the Smith case infected the panel, and thus the entire trial, with unfairness.

We agree that Kurth's analogy to the Smith case during voir dire was objectively unreasonable. We can think of many better examples he could have cited to illustrate his point that the jury must reserve judgment until it had heard both sides of the story, examples that would not have had the unfortunate parallel of Smith's televised pleas for return of her children. We address the likelihood of prejudice regarding this deficiency and the others outlined above in the next section of this opinion.

Individual and Collective Prejudice

As discussed above, we recognize that there were episodes when Kurth's performance fell below the constitutional threshold of objective reasonableness. His representation was deficient in adopting a strategy requiring introduction of Cody's "Tom did it" statement and thus threatening introduction of Cody's "Daddy did it" statement; his representation was deficient in failing to object when Frost was questioned about whether he believed Floyd to be telling the truth in certain damaging particulars; his representation was deficient when he failed to object to the prosecutor's repeated forays beyond the wide latitude given to him in discussing the evidence; and, finally, his representation was deficient when he referred to the Smith case during voir dire.

We nevertheless do not believe Floyd has met his burden under the second prong of our ineffective assistance of counsel analysis. He has not demonstrated that any one of these individual failings, or that these failings considered collectively, so undermined the

fairness of his trial as to impair our confidence in its outcome. See *Chamberlain,* 236 Kan. at 657 ("Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome.").

Although Cody's statement was damaging, given the jury's knowledge of his age, and inconsistent, we are not prepared to say that it prejudiced Floyd's case. The State introduced other, far more damaging evidence, principally Tom's recitation of Floyd's admissions the day after C.A.'s disappearance. As we observed in our opinion on Floyd's direct appeal, Tom's credibility was critical; and the jury chose to believe him.

With regard to Frost's testimony, as the district court noted, Frost's judgments about Floyd's credibility comprised very small portions of the trial evidence; and, even if Frost's objectionable statements had been omitted, the jury still would have heard Floyd's statements that he went to the trailer the day C.A. disappeared and that he loved her.

Our assessment of the likely effect of the prosecutor's improper arguments during closing is similar. Despite them, we note that the prosecutor also repeatedly argued that the perpetrator was either Tom or Floyd: "[T]here's only two people that really could have done it . . . . Now, I'm arguing to you that Floyd did it." This was the essence of this case, and the prosecutor's missteps in reciting what the evidence showed were not enough to take the jury's eyes off this ball.

Finally, although we view Kurth's reference to the Smith case as clumsy and regrettable, we do not accept Floyd's assertion that the rest of the trial was poisoned as a result. Kurth did make his true point clear. He told the jury he was mentioning Smith because her case demonstrated the value of waiting to hear both sides of a particular story. He succeeded in communicating that Tom's version of events would not be the only version worthy of belief.

Floyd also urges us to hold that Kurth's mistakes amounted to reversible ineffective assistance because Kurth's representation of a different defendant in a separate case merited that treatment. This argument has no merit. Kurth's performance in other cases is not relevant here. We also are unmoved by Floyd's citation to sev-

eral extrajurisdictional cases in which courts have reversed convictions after determining that counsel's "strategy" in introducing evidence was unreasonable where the result of such admission was also "fundamentally unfair," *Doles v. State*, 786 S.W.2d 741, 747 (Tex. Ct. App. 1989); "devastating," *People v. Phillips*, 227 Ill. App. 3d 581, 589, 592 N.E.2d 233 (1992); or "inherently prejudicial," *Emilio v. State*, 263 Ga. App. 604, 605, 588 S.E.2d 797 (2003). For the reasons already discussed, we do not view the errors made by Kurth as "fundamentally unfair," "devastating," or "inherently prejudicial."

On the record before us, this was a difficult case. Two brothers accused each other of vile crimes. There was ample evidence to support each accusation. The jury, after weighing all of its substance and the credibility of the many witnesses, was persuaded that the State prosecuted the right brother. Although, in the hands of another defense lawyer, the case may have been tried to another conclusion, "may" is not good enough. In order to reverse, we must be convinced that, but for counsel's deficiencies, there was a reasonable probability of a different outcome. *Gleason*, 277 Kan. At 644. We are not so convinced. Floyd's trial, while not perfect, was fair. See *State v. Johnson-Howell*, 255 Kan. 928, 952, 881 P.2d 1288 (1994).

Affirmed.

LUCKERT, J., not participating.
LOCKETT, J., Retired, assigned.