NOT DESIGNATED FOR PUBLICATION

No. 112,344

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANTWAN PEPPERS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed October 23, 2015.
Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, for appellant.

*Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before HILL, P.J., BUSER, J., and WILLIAM R. MOTT, District Judge, assigned.

*Per Curiam:* In cases collaterally attacking a criminal conviction, appellate courts
will not act as Monday-morning quarterbacks and second-guess trial lawyers who are
forced by circumstances to make tough strategic choices after a thorough investigation of
the law and facts. Defense counsel here laid the groundwork to present an alibi defense.
After further investigation, however, they had good reasons to abandon the defense.
Antwan Peppers now contends his counsel were deficient and his convictions should be

1

overturned. We affirm the denial of Peppers' K.S.A. 60-1507 motion for his failure to show his defense counsels' actions fell below an objective standard of reasonableness.

*Antwan Peppers shot and killed a man outside a Topeka bar.*

A jury convicted the defendant, Antwan Peppers, of one count of first-degree murder and one count of attempted first-degree murder for a shooting that occurred at Terry's Bar and Grill in Topeka, in 2006. The court sentenced the defendant to life in prison for murder, along with a consecutive 272-month term for the attempted first-degree murder conviction. The Kansas Supreme Court affirmed the convictions in *State v. Peppers*, 294 Kan. 377, 276 P.3d 148 (2012). The facts of the case can be found in that opinion.

The defendant has attacked his convictions in a K.S.A. 60-1507 motion. The district court boiled the issues down to one: whether his trial attorneys were ineffective for failing to contact and investigate an alibi witness. The court took evidence on the matter.

The defendant argued that his trial team, which consisted of Wendell Betts, Jennifer Roth, and Scott Gesner—all from the Shawnee County Public Defender's Office—was ineffective because they failed to contact his cousin, Dante Peppers, who was a potential alibi witness. The defendant alleged Dante would have testified at trial that they were together at a nightclub in Lawrence on the night of the shooting. The court took evidence on the issue. The defendant testified at the evidentiary hearing. He also called Dante and a third witness, Jesse Forbes.

*We condense the testimony.*

Dante testified he was with the defendant on July 15, 2006—the day of the murder. Dante said he first saw the defendant early in the afternoon and then later in the evening at his house at 21st and Buchanan in Topeka. Dante testified he and the defendant hung out at his house drinking with some women and then decided to go to a club in Lawrence called "The Last Call." The group left Topeka to go to The Last Call between 11 p.m. and 11:30 p.m.

Dante also testified that he spoke with an acquaintance, who he knew as "J," who told him he was at Terry's Bar and Grill where the shooting occurred. Dante testified that right before the defendant's trial he was contacted by defense attorney Betts who asked to meet with him. He and the defendant's brother, Laren, went to Betts' office but Dante could not remember what they discussed. He testified he thought he told Betts he was with the defendant on the night of the murder and that they went out. He did not remember telling Betts specifically that the group went out to The Last Call but did remember telling Betts about what "J" had told him.

"J" turned out to be a man named Jesse Forbes who was acquainted with Dante and the defendant. He testified at the evidentiary hearing that he had been at Terry's Bar and Grill the night of the murder and saw the victims ordering food inside the bar. After the victims left the bar and went back to their car, Forbes testified he heard gunshots, went outside, and saw men running from the scene. He did not recognize any of the men as the defendant and had not seen the defendant at the bar that night. He testified that after he heard the defendant had been arrested, he told Dante he was willing to testify on the defendant's behalf. Dante told Forbes he would pass that information on to the defendant's attorney. Forbes said he never heard from Betts or any member of the defendant's legal team.

3

Antwan, the defendant, also testified at the evidentiary hearing. He said that during trial he told his counsel Betts that he needed to contact Dante Peppers because he would provide an alibi. He did not give him any other names of people he was with on the night of the murder or provide any details about his whereabouts, and he specifically did not tell him he was at The Last Call. At trial, the defendant asked Betts why Dante had not testified and Betts told him that he did not need him.

In response, the State called the three attorneys—Betts, Roth, and Gesner—to testify. In addition, the State presented the testimony of Terry Walker, the owner of Terry's Bar and Grill, and Detective Don Kennedy, the lead detective in the case. Betts testified he had been a criminal defense attorney for 30 years and had participated in 600-700 jury trials, including up to 100 homicide cases. He was not assigned to the case until approximately 2 months before trial and was brought in because of his expertise in trying homicide cases. Gesner and Roth stayed on in support and at least three other attorneys in the Shawnee County Public Defender's Office assisted with the case.

*Why the defendant's defense team did not use the alibi defense is explained.*

All three attorneys discussed the alibi defense. Roth testified that as the defense team reviewed the discovery materials they had received from the State, they came across a report that mentioned Dawn Diggins—the defendant's former girlfriend—said Dante and the defendant might have been together at 21st and Buchanan on the night of the homicide.

Based on this information, Roth and Gesner decided to investigate and corroborate any alibi. The team filed a notice of alibi, giving the State notice that the defense team intended to present evidence that the defendant was with Dante at 21st and Buchanan on the night of the homicide. The notice did not include any other potential witnesses besides Dante. The defense team had trouble making contact with Dante and finally

4

reached him after the trial had started. Gesner spotted Dante outside of the courthouse and told him to get in contact with Betts to speak about the alibi defense. Dante and Laren met with the defense team and Dante explained that he and the defendant were at his house at 21st and Buchanan on the night of the homicide with some people, but did not specify who all of the people were.

Betts testified that Dante never mentioned going to The Last Call in Lawrence. Dante also mentioned something about "J" having information but could not provide Betts with "J's" full name or contact information. Dante said he would have "J" contact Betts. Betts testified he did not personally attempt to locate or investigate "J" because he had no information on how to reach him. Betts talked to the defendant about his meeting with Dante, and the defendant agreed that he was at 21st and Buchanan but provided no other details about the night and never mentioned going to The Last Call.

After the defense filed its notice of alibi, the State sent Detective Don Kennedy to interview Dante regarding the alibi defense. Detective Kennedy interviewed Dante after the trial had begun. In this interview, Detective Kennedy asked Dante to tell him what he had been doing on the day of the homicide. He did not specifically ask him if he had been with the defendant because he "didn't want to put words in his mouth." Dante asked Detective Kennedy what the interview had to do with the defendant and Detective Kennedy responded he was trying to pinpoint the defendant's whereabouts. Even after this statement, Dante still did not indicate he had been with the defendant that night.

Detective Kennedy had previously interviewed the defendant in 2006 after the shooting. Kennedy testified that during the 2006 interview, the defendant had never mentioned being with Dante at 21st and Buchanan the night of the shooting.

Defense attorney Roth testified she received a report of Detective Kennedy's interview of Dante about 9 days after the defendant's trial had started. Roth said she

found the report to be "problematic" to the alibi defense. The defense team was also concerned about information they had received from Dawn Diggins. An investigator for the Public Defender's Office spoke with Diggins and she said that the defendant had called her the night of the murder and asked her to pick him up near Stormont Vail Hospital and to drive him by Terry's Bar and Grill. Betts testified he spoke with Diggins and she told him the same story and that if she was called to the stand, she would not lie. The defense team reviewed Diggins' phone records, which confirmed she had received a phone call from the defendant about 3-5 minutes after the homicide.

This information was inconsistent with Dante's story about the evening. Diggins' account of the night of the homicide along with the inconsistencies in Dante's story led the defense team to decide to abandon the alibi defense. Betts testified he consulted with Gesner and Roth and made the tactical decision to abandon the alibi defense. Roth also testified the decision was tactical. The team felt Dante's alibi testimony would be severely undermined on cross-examination by the inconsistencies arising in the two interviews with Detective Kennedy. Betts had retained Dante as a possible alibi witness but dismissed him after the team decided to abandon the alibi defense.

Betts testified he consulted with the defendant about the alibi defense. He told the defendant if they decided to go forward with the alibi defense, he would have to testify on his own behalf. He advised the defendant he did not think that was in his best interest, especially because he felt the trial was going favorably. He testified he never pressured the defendant to testify, he told him it was his choice, but the defendant decided not to testify.

Betts did admit he never told the defendant about the information the team had received from Diggins. When asked why, Betts explained he made a "calculated decision" not to tell [the defendant] and to not cross-examine Diggins because of the "highly volatile" environment surrounding the case.

After all of the evidence was heard, the defendant amended his K.S.A. 60-1507 motion to include an allegation that Betts' failure to share with the defendant the information he had received from Diggins about the alibi defense also constituted ineffective assistance of counsel.

In a carefully worded memorandum decision, the district judge found the decision not to pursue an alibi defense was reasonable trial strategy and did not constitute ineffective assistance of counsel. The court noted the decision to abandon the alibi defense was based on various factors, including the information provided by Diggins, and that Betts did not violate any professional rules when he did not inform the defendant about Diggins' information. The court denied the defendant any relief.

*The defendant raises one argument on appeal.*

The defendant argues the district court erred in denying his K.S.A. 60-1507 motion because his trial counsel was ineffective. He claims Betts' failure to tell him about Diggins' claim that she picked him up and drove him by Terry's Bar and Grill on the night of the murder constitutes ineffective assistance of counsel. He alleges that he was never given an opportunity to refute Diggins' statement and the failure to communicate this information was a violation of the Rules of Professional Conduct and deprived him of his right to present an alibi defense.

There is no mystery about the rules that govern our consideration of this issue. Since the defendant does not challenge the district court's findings of fact, we review the district court's legal conclusions de novo. Allegations of ineffective assistance of counsel must satisfy the constitutional standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This test has also been adopted by the Kansas Supreme Court. See *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014); *Thompson v. State*, 293 Kan. 704, 715-16, 270 P.3d 1089 (2011).

Under the *Strickland* test, the movant must establish: (1) that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less that that guaranteed by the Sixth Amendment to the United States Constitution; and (2) that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so severe as to deprive the defendant of a fair trial. *Miller*, 298 Kan. at 929. To establish prejudice, the movant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with reasonable probability meaning a probability sufficient to undermine confidence in the outcome. 298 Kan. at 934.

When applying the *Strickland* test, a reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time. *Thompson*, 293 Kan. at 715 (citing *Bledsoe v. State*, 283 Kan. 81, 90-91, 150 P.3d 868 [2007]).

When considering a claim of ineffective assistance of counsel, a reviewing court must consider it is generally within the province of a lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions. *Sola-Morales v. State*, 300 Kan. 875, 887-88, 335 P.3d 1162 (2014). Strategic decisions made by counsel after thorough investigation of the law and the facts are virtually unchallengeable. *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006).

The defendant advances at least four theories on how this failure to communicate resulted in ineffective assistance of counsel:

8

- Betts decided to abandon the alibi defense *solely* on Diggins' allegations without giving the defendant an opportunity to refute Diggins' statements. If the defendant had been given the chance to refute Diggins' story, the defense team may have decided to go forward with the alibi defense, which may have resulted in a significantly different outcome at trial.

- The defendant's decision to not testify was based on incomplete information because he did not know about Diggins' allegations.

- Betts violated the Rules of Professional Conduct by not communicating with the defendant.

- If Betts had communicated with the defendant about Diggins' allegations, he could have elicited impeachment material about Diggins from the defendant that could have been used on cross-examination of Diggins.

We start our analysis with a brief review of the district judge's ruling. The court noted there were many reasons—beyond the information from Diggins—that factored into the decision not to use the alibi defense. In addressing the defendant's argument that his counsel was ineffective for not informing him about Diggins' allegations, the district court found that violations of the Rules of Professional Conduct do not alone constitute ineffective assistance of counsel and can only be used as a factor to consider when determining whether counsel provided adequate representation. The court was troubled by the defendant's argument that he should have been given the chance to refute Diggins' allegations. The court noted Diggins *did* testify at trial; however, her story about picking up the defendant after the homicide was never elicited by the prosecution on direct examination. The court noted that there was no trial testimony from Diggins that the defendant needed to refute.

In fact, Diggins was called by the State to testify at the defendant's trial. She testified briefly about her relationship with the defendant and that she had given him a phone that was registered in her name. She answered some questions about three phone

9

calls that were made on the night of the homicide from the phone she had given the defendant. She was never asked any questions regarding her allegation that she picked the defendant up on the night of the homicide. The defendant's trial counsel did not cross-examine her. At the K.S.A. 60-1507 hearing, the State asked Betts why he did not cross-examine Diggins about her allegation that she picked up the defendant on the night of the homicide. Betts responded that it would not have been in the defendant's best interest to bring to light a story that was inconsistent with the defendant's potential alibi defense.

Although the district court pointed out that Diggins did not testify at trial about her interaction with the defendant after the murder, the court's rationale does not precisely resolve the defendant's argument. The defendant is not concerned with Diggins' trial testimony, but with the fact he did not have the opportunity to refute Diggins' allegations to his own attorneys when deciding whether to present an alibi defense.

The defense team spoke with Diggins while investigating the alibi defense and she told them she picked up the defendant after the homicide—a story entirely inconsistent with the defendant's alibi defense. The defendant asserts Betts should have told him Diggins' allegations were one of the reasons they were choosing to abandon the alibi defense. He claims that had he known about Diggins' allegations, he could have provided his attorneys with information that would attack Diggins' credibility or refute her allegations. He believes that had he been given this opportunity, his defense team may have decided to go forward with the alibi defense and the outcome of his case would have been different.

Basically, the defendant contends Betts violated the Rules of Professional Conduct which require an attorney to communicate with their client. See KRPC 1.4 (2014 Kan. Ct. R. Annot. 495). The rule speaks in terms of reasonableness:

10

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

The district court correctly pointed out that "[U]nprofessional conduct by defense counsel which violates a disciplinary rule contained in the Code of Professional Responsibility does not constitute ineffective and inadequate counsel as a matter of law." See *State v. Wallace*, 258 Kan. 639, 646, 908 P.2d 1267 (1995). A violation of a Rule of Professional Conduct is "simply one factor to be considered" when deciding whether a defendant received effective assistance of counsel. 258 Kan. at 646. Even if Betts violated the Rules of Professional Conduct by failing to communicate with the defendant regarding Diggins' information, this alone does not constitute ineffective assistance of counsel.

We evaluate Betts' performance from his perspective at the time of the trial, without the benefit of hindsight. Based on Betts' testimony, he made a strategic decision with the information he had available at the time. Betts testified he made the decision to not share Diggins' information with the defendant because he was in the middle of trial and trying to do the best he could with the evidence that would support the defendant and that the situation at the courthouse was extremely volatile.

Betts gave good reasons for not telling the defendant about Diggins' information, and the defendant provides no concrete evidence that would prove the withholding of that information was unreasonable, especially since the decision to abandon the alibi defense was based on other factors besides Diggins' allegations. There is evidence that Betts is overall a competent attorney. The defendant conceded that Betts took the alibi defense seriously enough to investigate and prepare it for trial. The defense team did all of the foundation work required in presenting an alibi defense. They decided it would not

11

succeed—a strategic decision. Other evidence in the case shows Betts did a thorough job of attempting to impeach eyewitness testimony. Betts' failure to discuss Diggins' information with the defendant did not fall below an objective standard of reasonableness and his performance did not constitute ineffective assistance of counsel.

The defendant's alternative arguments for why the lack of communication constituted ineffective assistance of counsel are unconvincing. The defendant claims his decision to not testify was uninformed because he did not know about Diggins' allegations. The defendant, however, does not show how this information would have altered his decision to testify. On direct examination by the State, Diggins did not testify about picking up the defendant on the night of the homicide, and Betts was not intending to elicit this injurious testimony from her through cross-examination or by examining her directly. Her story about picking up the defendant and driving him by Terry's Bar and Grill was never heard by the jury and, therefore, the defendant would have had nothing to refute. He provides no explanation for why his decision whether to testify would have changed if he had known about Diggins' allegations.

The defendant also argues to this court that if Betts had told him about Diggins' allegations, the defendant could have provided Betts with impeachment material for him to use during Diggins' cross-examination. Since Diggins did not testify about picking up the defendant on the night of the homicide, there was no reason for Betts to impeach Diggins' credibility.

The defendant contends it was unreasonable for Betts to withhold Diggins' allegations from him because he claims had he known about Diggins' story, he could have refuted her story or provided information that would have changed Betts' mind about abandoning the alibi defense. The problem with this argument, however, is the defendant provides no evidence that he actually had information that would refute Diggins' allegations to the extent that Betts would change course with the alibi defense.

12

It is very clear that Betts and the other defense attorneys were most concerned that their sole alibi witness, Dante, had given inconsistent interviews and would unlikely withstand cross-examination from the State. Diggins' story only reaffirmed their decision to abandon the alibi witness. The defendant's contention that he could have refuted Diggins' story is entirely speculative and does not conclusively prove Betts would have taken a different action regarding the alibi defense. Even if the defendant had provided Betts concrete information that Diggins was lying, Betts still had the enormous hurdle of Dante's inconsistencies to overcome. The defendant does not explain how refuting Diggins' story would have changed the potential alibi defense or the outcome of the trial. There is no reasonable probability that the outcome of the defendant's trial would have been different but for Betts' failure to disclose Diggins' allegations.

The defendant also claims that Jesse Forbes' testimony would have put a different light on the alibi defense which would have potentially resulted in a significantly different outcome of the trial. Dante told him he had information from an individual named "J." Dante had no other information about "J" but promised Betts he would try to locate him and have him contact Betts. Betts was never able to locate "J" and, therefore, he was not part of the alibi defense. "J"—who is actually Jesse Forbes—testified at the K.S.A. 60-1507 hearing that he did not see the defendant at the scene of the shooting. The defendant's argument that Forbes' testimony would have changed the outcome of the trial is perplexing because the defendant never alleged Betts was ineffective for not securing Forbes as a witness.

The defendant seems to accuse Betts of not making an effort to find Forbes; however, this is not the basis for his ineffective assistance claim. Betts testified at the K.S.A. 60-1507 hearing that Dante provided no other information about Forbes other than he was an African-American named "J." Betts had little information to investigate "J" and, therefore, relied upon Dante to help him locate Forbes. Dante did not help Betts locate Forbes before the trial and Betts did not include Forbes as an alibi witness on his

13

notice of alibi. Betts was reasonable in his investigation of the alibi defense and the defendant has not shown he was prejudiced by Betts not securing Forbes as an alibi witness.

We conclude that Betts' performance did not fall below an objective standard of reasonableness and thus, the defendant's claims do not meet the first step of the *Strickland* test. He is not entitled to K.S.A. 60-1507 relief.

Affirmed.