NOT DESIGNATED FOR PUBLICATION

No. 116,337

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALPHONSO BRISCOE,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed February 16, 2018. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Ellen Hurst Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER and ATCHESON, JJ.

BUSER, J.:  Alphonso G. Briscoe appeals the District Court of Saline County's denial of his K.S.A. 60-1507 motion. On December 18, 2007, a jury convicted Briscoe of several crimes related to a shooting that occurred on January 1, 2007, in Salina. Andrew S. Hartnett and Bobby Hiebert, Jr. jointly represented Briscoe throughout the trial. In August 2011 Briscoe filed a K.S.A. 60-1507 motion with the district court alleging that Hartnett and Hiebert's counsel was ineffective. After an evidentiary hearing, the district court denied Briscoe's petition. Briscoe appeals, claiming Hartnett and Hiebert were ineffective because they: (1) declined to cross-examine State's witness, Mary Taylor; (2) failed to impeach State's witness, Shawn Delforge, with his prior conviction for

1

misdemeanor insufficient funds check; and (3) unsuccessfully attempted to qualify Dr. Michael Lyman as an expert witness. Briscoe further argues the cumulative effect of these errors deprived him of his right to a fair trial. Finding no reversible error we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This criminal case arose from an ill-fated New Year's Eve party held at the Stiefel Theatre in Salina. Briefly summarized, the party was organized by James Burse, a music promoter, and Dana Crowder, a music producer. Burse had known Briscoe since childhood. Crowder had known Briscoe for about 10 years. Crowder's fiancée, Mary Taylor, was at the party and observed Briscoe and another man on the stage displaying gang signs. She testified that Crowder attempted to eject Briscoe from the party whereupon a fight broke out.

According to Crowder, during the disturbance Briscoe shouted an obscenity and struck him in the head. Crowder chased after Briscoe and grabbed him. Antwon Perry, who also knew Crowder and Briscoe, intervened by putting Briscoe in a choke hold before releasing him. Briscoe then left the building. As a result of the disturbance, Burse stopped the party and the revelers began to leave.

Later, as the hosts left the theater in the early morning hours, Crowder was confronted by Briscoe and three other individuals. Briscoe wanted to fight Burse but Crowder tried to walk past the group. According to Crowder, Briscoe took out a gun and put it in Crowder's face. As Crowder walked to the ticket booth he heard shots. Perry, who was in the vicinity, was struck in the heart by a bullet which resulted in about 20 days of hospitalization. Another eyewitness, Rico Hudson, who also knew Briscoe, witnessed him fire a handgun about four times in the direction of Crowder and saw Perry wounded on the ground. Taylor generally corroborated these accounts and also identified

Briscoe as the individual who confronted the group outside the theater and began shooting.

Briscoe was later interviewed by Investigator Andrew Meek. Briscoe admitted attending the party at the theater until the party closed down. As he was walking out the door about 1:30 a.m. he claimed that Crowder and others attacked him but he left the area and did not return. Briscoe denied he was present at the time of the later shooting. He claimed that after he left the theater he went to his girlfriend's house where he drank gin until about 3 a.m.

The State charged Briscoe with two counts of attempted first-degree murder and one count of criminal possession of a firearm. Hartnett and Hiebert jointly represented Briscoe throughout the criminal proceedings, including at trial. On December 18, 2007, a jury convicted Briscoe of the crimes as charged, and the district court sentenced him to a prison term of 620 months. A panel of this court later affirmed Briscoe's convictions. See *State v. Briscoe*, No. 101,753, 2010 WL 3731182 (Kan. App. 2010) (unpublished opinion). Hartnett voluntarily surrendered his law license in May 2009 and passed away in June 2010.

On August 24, 2011, Briscoe filed a pro se K.S.A. 60-1507 motion with the district court, which, with the help of counsel, he amended on May 24, 2013. In relevant part, the amended motion alleged that Hartnett and Hiebert provided ineffective assistance of counsel. The district court held an evidentiary hearing at which Hiebert testified. On July 15, 2014, the court denied Briscoe's petition.

Briscoe appeals.

3

Generally, a claim alleging ineffective assistance of counsel presents a mixed question of fact and law. When, as here, the district court conducts a full evidentiary hearing on the claims, appellate courts determine whether the district court's findings are supported by substantial competent evidence that would bolster the court's legal conclusions. The district court's conclusions of law are reviewed de novo. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

Judicial scrutiny of counsel's performance is highly deferential and requires consideration of all the evidence before the judge or jury. Appellate courts strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). Reasonable probability means a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015). Importantly, "[w]hen reviewing an attorney's alleged deficient performance, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of alleged deficiencies." *Sola-Morales*, 300 Kan. 875, Syl. ¶ 6; *Jones v. State*, No. 114,601, 2016 WL 7494363, at *4 (Kan. App. 2016) (unpublished opinion).

On appeal, Briscoe raises three separate instances that, in his view, prove ineffective assistance of counsel by his trial counsel. First, Briscoe contends his trial counsel were ineffective when Hartnett and Hiebert failed to cross-examine the State's witness, Taylor. Second, Briscoe claims trial counsel were ineffective when they declined

4

to impeach the State's witness, Delforge, with a prior crime of dishonesty—writing a misdemeanor insufficient funds check. Third, Briscoe argues his trial counsel were ineffective due to their unsuccessful attempt to qualify Dr. Lyman as an expert witness. We will address each of these contentions separately.

*Cross-Examination of Mary Taylor*

The right to cross-examination is derived from the Sixth Amendment to the United States Constitution; its primary purpose is to challenge the credibility of the State's witnesses. *State v. Brooks*, 297 Kan. 945, 952, 305 P.3d 634 (2013). Failure by counsel to impeach or cross-examine a witness whose testimony is vital to the State's case may prejudice the defendant and constitute ineffective assistance. 297 Kan. at 952-54. But, the "decisions on what witnesses to call, whether and how to conduct cross-examination . . . and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his or her client." *Bledsoe v. State*, 283 Kan. 81, 92, 150 P.3d 868 (2007).

At trial, Taylor testified as a State's eyewitness to the events that occurred before and during the shooting at the Stiefel Theater. Taylor testified that at the concert she noticed a man onstage who she described as "wired." When she asked her fiancé, Crowder, who the man was, Crowder responded, "[O]h, I grew up with him, his name is Alphonso [Briscoe]." Later in the evening, Taylor testified that Briscoe and another individual got on the stage and "started throwing up gang signs." When Crowder attempted to escort Briscoe out of the theater, Briscoe started "punching after [him]."

At the end of the evening, Taylor testified she heard Briscoe's brother tell Crowder that Briscoe "want[ed] [him] to bring the heat, which mean[t] gun." And, when Taylor, Crowder, and a group of others exited the theater later that morning, Taylor said the man

who "was jumping around the club, the one who swung at my fiancé, the one that was acting a fool, Alphonso," came up to them and started shooting.

After this testimony, the State asked Taylor about a written statement she submitted to law enforcement and a diagram of the crime scene on which she made some notations. Hiebert asked the district judge if the parties could approach the bench and, after the jury was excused, Hiebert objected:

> "Judge, [the State] is in possession of a written statement, I believe, purported to be made by Mary Taylor in this matter. Also, she indicated that there was possibly a diagram, which indicates that she went down to the Salina Police Department, gave this particular written statement to law enforcement. I do not have any evidence to show that she went down to law enforcement and made a written report. I do not see where she was interviewed by law enforcement. I do not believe that [Hartnett] has that either.
> . . . .
> "What we are going to ask for, Judge, is any written statement that she has in her possession or any diagram be stricken at this time.
> . . . .
> "I knew Ms. Taylor—we knew that Ms. Taylor was an endorsed witness of the State. As she begins [*sic*] to testify, one of the things I began to do is look for any information she may have given to law enforcement. In fact, one of my first questions was going to be on cross-examination what member of law enforcement did you speak with."

The State replied that it had provided trial counsel with Taylor's written report and diagram, and later produced two emails to corroborate the production of the documents. After some discussion, the district court ordered a brief recess to allow trial counsel to familiarize themselves with the exhibits.

When the trial resumed, the State once again sought to introduce Taylor's written statement and diagram into evidence. Hiebert objected to the admission because the exhibits were not provided prior to trial. Hartnett also objected to admission of the

written statement because Taylor was present in the courtroom. As a result, the State withdrew Taylor's written statement but the district court admitted the diagram on the condition that Taylor's notations were redacted. Hiebert did not cross-examine Taylor.

In his K.S.A. 60-1507 motion, Briscoe claimed Hiebert "had a duty to adequately prepare to examine all potential witnesses of [his] own and those of the State." He asserted, "[h]ad [Hiebert] cross examined [Taylor], counsel would have had the opportunity to highlight the inconsistencies in the testimony of all the essential witnesses of the state, which would have brought the credibility of the witnesses into question." However, Briscoe did not identify which inconsistencies Hiebert could have elicited from Taylor. At the hearing on the motion, Hiebert testified that upon review of the materials during the break, he probably discussed the situation with Briscoe and "determined that it would be better not to cross-examine Ms. Taylor to avoid the possibility of reinforcing with the jury, her testimony."

After considering the evidence, the district court determined that although the State had listed Taylor's statement and diagram on a summary of documents it claimed to have provided to defense counsel, "[t]rial counsel failed to recognize this omission, or perceived omission, prior to trial. This failure falls below the objective standard of reasonableness." The trial court continued:

> "The trial court allowed counsel a recess to review the materials and counsel met with the defendant and the investigator. After reviewing the materials, trial counsel made a strategic decision to not cross examine Ms. Taylor because they did not want to merely confirm the testimony provided on direct. There is no credible evidence that trial counsel refused to examine Ms. Taylor in an attempt to preserve and object to her testimony. Petitioner fails to provide evidence regarding what discrepancies, if any, trial counsel could elicit from Ms. Taylor on cross[-examination]. Petitioner has made no showing that he was prejudiced by trial counsel's failure to obtain the documents prior to trial nor has Petitioner demonstrated that the result of the proceeding would have been different."

7

On appeal, the parties reprise their arguments regarding whether trial counsel exhibited deficient performance in not cross-examining Taylor. However, the State did not cross-appeal the district court's finding that counsel's performance was deficient. As a result, this determination is final and not subject to appellate review. See K.S.A. 60-2103(h); *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008) ("We have clearly held that before an appellee may present adverse rulings to the appellate court it must file a cross-appeal. If the appellee does not, we have held that the issue is not properly before the court and may not be considered."); *Salazar-Moreno v. State*, No. 115,031, 2017 WL 383433, at *8 (Kan. App. 2017) (unpublished opinion) ("[B]ecause the State did not cross-appeal the district court's finding that the performance of Kerns and Battitori was deficient, the only issue before us is whether Salazar–Moreno was prejudiced by Kerns' and Battitori's deficient performance."). Whether this deficiency resulted in prejudice, however, merits our review.

On appeal, Briscoe claims prejudice by identifying five points that Hiebert mentioned in challenging Taylor's testimony during his closing argument. For example, Hiebert challenged Taylor's eyewitness identification of Briscoe by arguing to the jury that she had not met him prior to the shooting incident. Briscoe asserts that closing arguments are not evidence and "cannot be considered an adequate substitute for Hiebert's failure to get Taylor to concede [the points] on the witness stand through an effective cross-examination."

We fail to see how trial counsel's failure to cross-examine Taylor was prejudicial when Briscoe concedes that the five points of impeaching evidence were admitted through Taylor's direct examination or other witnesses, and Hiebert argued these defense points to the jury. While the most effective trial advocacy may have been to also elicit the impeaching testimony through cross-examination, this trial practice would not have been without risk. Taylor may have mitigated or explained away any impeachment if challenged on cross-examination. Hiebert's decision to forego cross-examination but

8

argue the impeaching aspects of her direct testimony and other witnesses' testimony about Taylor's account still accomplished the important objective of impeachment.

Additionally, although Briscoe emphasizes the importance of Taylor's eyewitness identification, this argument ignores the eyewitness testimony of three other witnesses—Brandon Beikman, Crowder, and Hudson—who identified Briscoe as the shooter in this case. Beikman testified that he saw Briscoe pull a gun from his pants, shoot several times, and run away, and later identified Briscoe as the shooter in a photographic lineup. Crowder testified that he had known Briscoe for 10 years, and that, as he was leaving the concert, Briscoe approached him, drew a gun, and fired several shots. Hudson also observed Briscoe take out a handgun and shoot it at Crowder several times. Especially in light of the testimony of the other eyewitnesses—who all knew Briscoe previously—it is highly unlikely that the jury would have reached a different verdict had Hiebert cross-examined Taylor about defense themes that were established by evidence derived from Taylor's direct examination or from other sources, and discussed by trial counsel in closing argument.

We hold that Briscoe was not prejudiced by trial counsels' failure to cross-examine Taylor because there is not a reasonable probability the jury would have reached a different result without trial counsels' deficient performance. See *Sola-Morales*, 300 Kan. at 882.

*Failure to Impeach Shawn Delforge*

Next, Briscoe claims his trial counsel were ineffective for failing to impeach another State's witness, Delforge, with his prior misdemeanor conviction for giving an insufficient funds check. The State responds that the decision not to impeach Delforge was simply a matter of trial tactics, and given that Delforge did not identify Briscoe as the shooter, his testimony was of limited importance. After hearing the evidence, the

district court found no deficient performance because "[w]hether or not trial counsel impeached Shawn Delforge with the prior conviction[] in their possession was a tactical decision."

Under K.S.A. 60-421, convictions for crimes involving dishonesty or false statement are admissible for purposes of impeaching a witness' credibility. The State does not contest that Delforge's prior conviction constituted a crime of dishonesty or false statement. Like cross-examination, the decision to impeach a witness is a matter of trial strategy left to counsel. See *Brooks*, 297 Kan. at 952. Nevertheless, failure by counsel to impeach the testimony of a vital State witness may prejudice the defendant and constitute ineffective assistance. 297 Kan. at 952-54.

Delforge worked as a bartender at the Stiefel Theater during the New Year's Eve party. At trial, Delforge testified that he remembered Briscoe specifically because "[h]e was walking around with [his own] liquor that night," a point of particular concern "[b]ecause it [had] to do with our catering license." When a fight broke out in the theater, Delforge identified Briscoe as one of the participants. Later, outside the theater, Delforge saw two men approach a group of people exiting the building, heard several gunshots, and noticed the "guy with the gun [take] off." When questioned by Hiebert on cross-examination, Delforge admitted he did not "know what [Briscoe's] particular role was in th[e] . . . scuffle," and readily confirmed he did not see—and could not identify—the person who shot the gun outside the theater. It is uncontroverted that Hiebert did not impeach Delforge with his prior conviction for writing a misdemeanor insufficient funds check.

On appeal, Briscoe does not explain how the failure to raise the issue of Delforge's prior misdemeanor insufficient funds check was necessarily deficient performance. In the constellation of crimes of dishonesty, a misdemeanor insufficient funds check is noteworthy for its rather minor significance. By challenging Delforge on such a petty

10

offense, trial counsel risked alienating the jury especially when Delforge's testimony was not critical to the State's prosecution. Briscoe has not shown how trial counsels' failure to impeach a witness given such a minor prior conviction under these circumstances is necessarily deficient performance.

Briscoe asserts he was prejudiced, however, because "Delforge's testimony characterized Briscoe as violent (one of the people in the fight) and a law breaker (walking around with liquor, which was not permitted), [which] bolster[ed] testimony that he had been the shooter." The record does not support this claim.

Hiebert thoroughly cross-examined Delforge, and, on several key points, elicited responses favorable to the defense. For instance, Delforge admitted he did not know Briscoe's role in the fight during the concert and, more importantly, made clear that he did not, and could not, identify Briscoe as the shooter. Given the multitude of State's witnesses who testified that Briscoe's behavior at the party was similar to Delforge's observations, the lack of impeachment by Hiebert was hardly prejudicial.

Upon our review of the trial evidence, we conclude there is not a reasonable probability the jury would have reached a different result if defense counsel had impeached Delforge with evidence of his prior conviction. See *Sola-Morales* 300 Kan. at 882.

*Inability to Qualify Dr. Michael Lyman as an Expert Witness*

On the third day of trial, outside the presence of the jury, Hartnett and Hiebert attempted to qualify Dr. Lyman, a criminal justice professor at Columbia College of Missouri, as an expert witness. Hartnett presented the district court with Dr. Lyman's curriculum vitae and then asked Dr. Lyman to discuss the nature of his proposed expert testimony. Dr. Lyman explained:

"Well, the overriding area [of the investigation I would discuss] is the identification of Alphonso Briscoe as a suspect in this case and the fact that there's clear evidence in this case that there are other suspects that could and should have been investigated as well. And there's evidence in this case that a reasonable investigator would consider as that which would eliminate Alphonso Briscoe as a suspect in this case.

. . . .

"[I would address] [t]hings that were done, but incorrectly, and things that were not done that should have been done. In particular the taking of gunshot residue swabs which [Salina Police] policy requires, the initiation of a neighborhood canvas in the downtown area, which their policy requires and was not done. The taking of fingerprints off the maroon van and the red [Nissan] to identify persons that may have occupied those vehicles, and that was not done. That's also required by their policy. To interview likely suspects that were available, but just—just not interviewed. In particular, individuals over at Alphonso Briscoe's home the night of the shooting."

On cross-examination by the State, Dr. Lyman conceded that although he claimed he had worked as an investigator for the Kansas Bureau of Investigation his employment ended in 1980. Dr. Lyman also acknowledged he had not "kept up to date with the policies of national law enforcement agencies such as the F.B.I. or the ATF on gunshot residue."

The district judge denied Briscoe's request to find that Dr. Lyman was an expert on criminal investigations, reasoning:

"The biggest concern I have is looking at his . . . curriculum vitaw, that he has worked since August of 1989 to the present as, basically, a professor . . . .

. . . .

"So, for about the past 18 years he has worked as a professor as opposed to actually in law enforcement. There has also been no evidence that he has offered that he's familiar with what the standard of practice is in a community the size of Salina for investigations. . . .

12

"It's also a concern of the Court that . . . this witness testified he was not even familiar with the ATF and F.B.I. procedures relating to the gun residue which seems, to the Court, to be something relatively basic and certainly one of the issues in this court.

". . . [T]he defense, certainly, has had the option and the opportunity and has, in fact, cross-examined the various State witnesses regarding their investigation, the evidence they have seized and chosen to have tested."

On direct appeal, Briscoe contested the district court's ruling disallowing Dr. Lyman's expert testimony. Our court affirmed the convictions, however, stating: "Given the subject matter of [Dr.] Lyman's opinions and his history in the field of his claimed expertise, we find no abuse of discretion in the district court's rejection of the testimony of this witness." *Briscoe*, 2010 WL 3731182, at *2.

In this K.S.A. 60-1507 appeal, Briscoe claims trial counsel made deficient attempts to qualify Dr. Lyman as an expert witness. Specifically, Briscoe alleges Hartnett and Hiebert "inadequately prepared for trial by failing to verify that [Dr. Lyman] was sufficiently qualified as an expert in the area for which he was being called to testify." In support, Briscoe relies on the expert opinions of Michael Whalen, a criminal defense attorney, who testified at the evidentiary hearing. According to Whalen, the attempts to qualify Dr. Lyman were deficient because "Hartnett never attempted to rehabilitate [Dr. Lyman], he never attempted to put on what his qualifications were, or . . . even what his background was that would allow him to testify and assist the jury in their analysis."

At the evidentiary hearing, the district court found: "Whether to designate Dr. Lyman as an expert was within the sound discretion of the Court and trial counsel's efforts did not fall below an objective standard of reasonableness."

At the outset, the district court properly found that it had the discretion to allow or disallow the expert testimony proffered by Dr. Lyman. "The qualification of an expert witness and the admissibility of expert testimony are both matters within the broad

13

discretion of the trial court." *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 70, 274 P.3d 609 (2012); *State v. Lippard*, No. 114,588, 2017 WL 3837700, at *8 (Kan. App. 2017) (unpublished opinion). Given this broad judicial discretion, an attorney proffering an expert witness is never assured that the trial court will find the expert is qualified or that, if qualified, the expert will be allowed to express a particular expert opinion.

In this case, trial counsel submitted Dr. Lyman's curriculum vitae as evidence of his expert qualifications in the area of criminal investigations. In relevant part, that document memorialized Dr. Lyman's experience in criminal justice matters, including:

- Professor of Criminal Justice from 1989 to the present at Columbia College of Missouri, which included a position as Director of the Forensic Science Program, and teaching undergraduate and graduate courses in criminal investigation and police procedures;

- Participated in 600 arrests as a law enforcement officer and testified in 250 criminal trials and hearings;

- Instructor at the University of Missouri Law Enforcement Training Institute from 1986-1989;

- Senior Agent for the Oklahoma Bureau of Narcotics and Dangerous Drugs from 1981-1986;

- Special Agent for the Kansas Bureau of Investigation from 1975-80;

- Visiting Professor teaching law enforcement administration, University of Oklahoma from 1986-1989;

- Author of 5 textbooks and 5 articles relating to criminal justice topics from 2003-2008;

- Expert consultant in 100 cases from 30 states, including testifying as an expert witness on criminal justice issues on 51 occasions, without ever being disqualified.

Given Dr. Lyman's expert qualifications in criminal justice matters, both as a law enforcement officer and academician, we concur with the district court's assessment that trial counsel was not deficient in presenting him as an expert witness. In particular, given Dr. Lyman's extensive experience as a testifying expert witness, the fact that this district court was the *first* court to find him unqualified to testify suggests that trial counsel in this case had every reason to anticipate Dr. Lyman would be allowed to testify as an expert regarding criminal investigations.

With regard to prejudice, the district court made extensive findings:

"Trial counsel attempted to qualify Dr. Lyman as an expert through testimony and the doctor's curriculum vitae. The trial court responded that Dr. Lyman was not qualified [and] would not testify as an expert. However, the Court's analysis went beyond Dr. Lyman's qualifications. The Court also noted the defense had ample opportunity to address the investigative deficiencies during cross examination of law enforcement officers. Trial counsel admitted as exhibits copies of the Salina Police Department's policies governing investigations. Trial counsel elicited testimony that the police department did not obtain fingerprint evidence, failed to request DNA testing, and that law enforcement did not test for gun residue. Trial counsel confronted investigators with the fact that they did not follow Department protocol regarding fingerprint testing. Trial counsel pointed out that neither the Nissan nor the van were processed for evidence, there was no search of the Nissan, the skull cap was not tested, and that law enforcement failed to search several residences. Trial counsel used the State's own witnesses to point out deficiencies in the investigation. The expert retained by trial counsel walked the scene with counsel and assisted in preparing the defense. Trial counsel utilized their expert as a consultant and elicited testimony from the State's own witnesses regarding investigative deficiencies rendering testimony from Dr. Lyman duplicitous. Whether to designate Dr.

15

Lyman as an expert was within the sound discretion of the Court and trial counsel's efforts did not fall below an objective standard of reasonableness. Even if trial counsel's attempt to qualify Dr. Lyman was deficient, it did not prejudice the defense or deprive the defendant of a fair trial. The outcome of the case would not have been different had Dr. Lyman testified."

We agree with the district court that Briscoe suffered no prejudice. The district court's findings are well supported by substantial competent evidence. Undoubtedly due to trial counsel's pretrial consultations with Dr. Lyman, trial counsel energetically challenged the deficiencies and omissions in the State's criminal investigation. This cross-examination occasionally even led to admissions by investigators that certain investigative procedures were not followed.

Upon our review, we conclude there is not a reasonable probability the jury would have reached a different result if defense counsel had assessed and presented the expert qualifications of Dr. Lyman in a more effective manner to the district court, or if Dr. Lyman had actually testified as an expert witness at trial. See *Sola-Morales* 300 Kan. at 882.

*Cumulative Error*

Finally, Briscoe claims that trial counsels' cumulative errors denied him a fair trial. Although trial counsel deficiently performed when they failed to recognize the omission, or perceived omission, of the Taylor interview and diagram prior to trial, a single error may not constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014). This issue is without merit.

Affirmed.